IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| NATIONAL WILDLIFE FEDERATION, et al., | ) Civ. No. 3:20-cv-00443-DWD |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES ARMY CORPS OF ENGINEERS, et al., | ) Judge: David W. Dugan |
| | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

**INTRODUCTION AND SUMMARY OF ARGUMENT**. . . . . . . . . . . . . . . . . . . . . . . . . . 1

**STANDARD OF REVIEW**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**ARGUMENT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**I.  THE CORPS VIOLATED THE NATIONAL ENVIRONMENTAL POLICY ACT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

   **A.  THE FSEIS IGNORES MANY IMPACTS OF O&M ACTIVITIES**. . . . . . . . . . . 2

   **B.  THE FSEIS' PURPOSE AND NEED STATEMENT IS TOO NARROW**. . . . . . . 2

      **1.  The Purpose and Need Statement Improperly Limits Alternatives.**. . . . . . . . . . 3

      **2.  The Purpose and Need Statement Ignores New Environmental Laws and the Project's Own Authorizing Legislation.**. . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      **3.  The Purpose and Need Statement Fails to Demonstrate Project Need.**. . . . . . . . 6

   **C.  THE FSEIS IGNORES REASONABLE ALTERNATIVES**. . . . . . . . . . . . . . . . . 6

      **1.  The FSEIS Allows Only a Binary Choice Between the Project and No Project**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      **2.  The FSEIS Ignores Alternatives Requiring Congressional Authorization**. . . . . 9

      **3.  The FSEIS Fails to Evaluate a Reasonable Range of Effective Alternatives.**. . 10

      **4.  The FSEIS Fails to Provide Informed Consideration of Alternatives.**. . . . . . . 11

      **5.  The FSEIS Fails to Identify the Environmentally Preferable Alternative**. . . . 12

   **D.  THE FSEIS FAILS TO ADEQUATELY ANALYZE PROJECT IMPACTS**. . . . . 12

      **1.  The FSEIS Ignores Irrefutable Science and Data Showing Project Impacts**. . . 12

         **(a) Flood Heights and Flood Response**. . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

         **(b) Sediment Loading and Transport, Hydrology and Hydraulics**. . . . . . . . . 13

         **(c) Main Channel Border Habitat Model**. . . . . . . . . . . . . . . . . . . . . . . . . . 14

         **(d) Nineteen Mile Modeled Reach**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

i

**(e) Independent External Peer Review Panel Comments**. . . . . . . . . . . . . . . . . . 16

**2. The FSEIS Fails to Accurately Establish Baseline Conditions**. . . . . . . . . . . . . 17

**3. The FSEIS Fails to Adequately Evaluate Flooding Impacts**. . . . . . . . . . . . . . . 19

**4. The FSEIS Fails to Evaluate Side- and Back-Channel Impacts**. . . . . . . . . . . . 19

**5. The FSEIS Fails to Meaningfully Evaluate Mitigation**. . . . . . . . . . . . . . . . . . . 20

**II.   THE CORPS VIOLATED THE WATER RESOURCES DEVELOPMENT
      ACT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**III.  THE CORPS VIOLATED  THE FISH AND WILDLIFE COORDINATION
      ACT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**IV.   THE CORPS VIOLATED THE 1927 RIVERS AND HARBORS ACT** . . . . . . . . . . . 24

**CONCLUSION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

## CASES

*Alaska Wilderness Recreation and Tourism v. Morrison* ("*Alaska Wilderness*")
    67 F.3d 723 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Bob Marshall Alliance v. Hodel*
    852 F.2d 1223 (9th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,11

*Citizens Against Burlington v. Busey* ("*Burlington*")
    938 F.2d 190 (D.C. Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 6, 8

*City of Sausalito v. O'Neill*
    386 F.3d 1186 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Colorado Envtl. Coal. v. Dombeck*
    185 F.3d 1162 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Confederated Tribes and Bands of the Yakima Indian Nation v. F.E.R.C.*
    746 F.2d 466 (9th. Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Davis v. Mineta*
    302 F.3d 1104 (10th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Environmental Defense Fund v. Corps of Engineers*
    492 F.2d 1123 (5th Cir. 1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Environmental Defense Fund v. Froehlke*
    473 F.2d 346 (8th Cir. 1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 24

*Friends of Back Bay v. U.S. Army Corps of Engineers*
    681 F.3d 581 (4th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Friends of the Earth v. Hall* ("*Hall*")
     693 F. Supp. 904 (W.D.Wash 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 16

*Half Moon Bay Fishermen's Mktg. Ass'n. v. Carlucci*
    857 F.2d 505 (9th Cir.1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Heartwood, Inc. v. U.S. Forest Service*
    73 F.Supp.2d 962 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Israel v. U.S. Dep't of Agric.*,
    282 F.3d 521 (7th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Izaak Walton League of America v. Marsh*
    655 F.2d 346 (D.C. Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Kern v. U.S. Bur. Land Mgmt.*
    284 F.3d 1062 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

iii

*Kleppe v. Sierra Club*
427 U.S. 390 (1976)............................................................. 11

*Missouri ex rel Ashcroft v. U.S. Army Corps of Engineers*
526 F.Supp. 660 (W.D. Mo. 1980). ........................................ 24

*Muckleshoot Indian Tribe v. U.S. Forest Service ("Muckleshoot")*
177 F.3d 800  (9th Cir. 1999)................................... 7, 10, 11

*National Parks and Conservation Assn. v. Bureau of Land Management ("National Parks")*
606 F.3d 1058 (9th Cir. 2010)....................................... 3, 6

*Natural Resources Defense Council, Inc. v. Morton ("NRDC")*
458 F.2d 827 (D.C. Cir. 1972). ............................... 7, 8, 9, 10

*Neighbors of Cuddy Mountain v. U. S. Forest Service*
137 F.3d 1372 (9th Cir. 1998). .................................... 20-21

*North Carolina Wildlife Federation v. North Carolina Dept. of Transp.*
677 F.3d 596 (4th Cir. 2012). ..................................... 15

*Northern Plains Res. Council, Inc. v. Surface Transp. Bd.*
668 F.3d 1067 (9th Cir. 2011). ................................... 14

*Oregon Nat. Desert Ass'n v. Jewell ("Jewell")*
840 F.3d 562 (9th Cir. 2016). ................................. 17, 19

*Resources Ltd., Inc. v. Robertson*
35 F.3d 1300 (9th Cir. 1993). .................................... 7-8

*Robertson v. Methow Valley Citizens Council*
490 U.S.332 (1989). .......................................... 15, 20

*Save Our Cumberland Mountains v. Kempthorne ("Cumberland")*
453 F.3d 334 (6th Cir. 2006). ................................... 8, 9

*Sierra Club v. Espy*
38 F.3d 792 (5th Cir. 1994).. ...................................... 7

*Sierra Club v. Marita, ("Marita")*
46 F.3d 606 (7th Cir. 1995). ...................................... 18,

*Sierra Club, Illinois Chapter v. U.S. Dept. of Transp.*
962 F. Supp. 1037 (N.D.Ill. 1997).............................. 14

*Sherr v. Volpe*
466 F.2d 1027 (1972)............................................... 1

*Simmons v. United States Army Corps of Eng'rs*
120 F.3d 664 (7th Cir. 1997)..................................... 3

iv

*South Fork Band Council v. U.S. Dept. of Interior*
    588 F.3d 718 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*State of California v. Block*
    690 F.2d 753 (9th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 16

*Swain v. Brinegar*
    542 F.2d 364 (1976).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Texas Committee on Natural Resources v. Marsh*
    736 F.2d 262 (5th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*Vermont Pub. Int. Rsch. Grp. v. U.S. Fish & Wildlife Serv.*
    247 F. Supp. 2d 495 (D.Vt. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Westlands Water Dist. v. U.S. Dep't of Interior*
    376 F.3d 853 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Wilderness Soc'y v. BLM*
    822 F. Supp. 2d 933 (D. Ariz. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Wisconsin v. Weinberger*
    745 F.2d 412 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Wyoming Outdoor Council v. U.S. Army Corps of Eng'rs*
    351 F. Supp. 2d 1232  (D. Wyo. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## STATUTES

United States Code, Title 5

    § 706.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

United States Code, Title 16

    § 661 et seq. (Fish and Wildlife Coordination Act ("FWCA")). . . . . . . . . . . . . . . . . . *passim*
    § 661.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    § 662 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    § 662(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    § 662(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23
    § 662(g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

United States Code, Title 33

    § 2283 (WRDA of 1986 (P.L. 99-662) § 906).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    § 2283(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    § 2283(a)-(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    § 2283(d) (WRDA of 2007 (P.L. 110-114) § 2036). . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    § 2283(d)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

v

§ 2316 (WRDA of 1990 (P.L. 101-640) § 306)................................................. 5
§ 2343................................................................................ 1

United States Code, Title 42

§ 1962-3(a)(3) (WRDA of 2007 (P.L. 110-114) § 2031)........................... 5
§ 4321 et seq. (National Environmental Policy Act ("NEPA"))........................ 1

Rivers and Harbors Act ("RHA") of 1927
Ch. 47, 44 Stat. 1010.............................................................. 1
44 Stat. at 1012................................................................... 3

## REGULATIONS

Code of Federal Regulations, Title 33 (2017)

§ 236.4............................................................................. 5

Code of Federal Regulations, Title 40 (2017)

§ 1500.1(b)....................................................................... 13
§ 1502.5.......................................................................... 16
§ 1502.14....................................................................... 7, 9
§ 1502.14(c)................................................................. 7, 8, 10
§ 1502.22...................................................................... 14, 15
§ 1502.22(a).................................................................. 15, 18
§ 1505.2(b)....................................................................... 12

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs seek to compel Defendants ("Corps") to conduct urgently needed environmental reviews and perform critical statutory duties to address the severe adverse impacts of their Regulating Works Project ("Project") on the Middle Mississippi River ("MMR").  Admin. Record ("AR") 930-931, 985.  Plaintiffs challenge the Corps' Record of Decision ("ROD") approving its Final Supplemental Environmental Impact Statement ("FSEIS") on the Project's massive river training structures ("regulating works") and related "operations and maintenance" ("O&M") activities.  The Corps must comply with NEPA, 42 U.S.C. § 4321 et seq., the Water Resources Development Act ("WRDA"), 33 U.S.C. §§ 2283 and 2343, the Fish and Wildlife Coordination Act ("FWCA"), 16 U.S.C. § 661 et seq., and the Rivers and Harbors Act ("RHA") of 1927 (ch. 47, 44 Stat. 1010).  Plaintiffs' Motion (ECF 34-1; "MSJ") showed the Corps' FSEIS violated NEPA because (1) it ignores the impacts of O&M activities (MSJ 16-17)), (2) its Purpose and Need Statement is too narrow (MSJ 17-20), (3) it ignores reasonable alternatives (MSJ 20-27) and (4) it fails to adequately evaluate Project impacts on flood heights, sediment loading, main-, side- and back-channel border habitat, and baseline conditions, and mitigation of those impacts (MSJ 27-41).  Plaintiffs also showed the Corps violated: (1) the WRDA by failing to prepare a detailed mitigation plan (MSJ 42-45), (2) the FWCA by failing to conduct adequate consultation with the Fish and Wildlife Service and reporting to Congress ("FWS") (MSJ 45-49), and the RHA by exceeding its limits on river channel narrowing (MSJ 49-50).

The Corps' denials of its violations fail as shown below.  Corps. Opp.  (ECF 40-1; "Corps").

## STANDARD OF REVIEW

The Corps claims review under the Administrative Procedure Act ("APA"), 5 U.S.C.§ 706 is "highly deferential," quoting *Israel v. U.S. Dep't  of Agric.*, 282 F.3d 521, 526 (7th Cir. 2002). *Israel* is inapposite because it did not apply environmental laws.  The Seventh Circuit enforces NEPA's mandate that agencies must take a "hard look" at environmental impacts (*Sherr v. Volpe*, 466 F.2d 1027, 1031-1035 (1972) (agency violated NEPA); *Swain v. Brinegar*, 542 F.2d

1

364, 369-371 (1976) (same); *Wisconsin v. Weinberger*, 745 F.2d 412, 416-428 (1984) (same)), as does this District (*Heartwood, Inc. v. U.S. Forest Service*, 73 F.Supp.2d 962, 977-980 (1999)).

## ARGUMENT

## I.   THE CORPS VIOLATED THE NATIONAL ENVIRONMENTAL POLICY ACT

### A.  THE FSEIS IGNORES MANY IMPACTS OF O&M ACTIVITIES

The FSEIS claimed the impacts of O&M activities were the same for all alternatives, and thus did not evaluate them in detail.  MSJ 16-17.  The Corps' denials fail.  Corps 12-13.  The FSEIS's purpose and need section (AR 951-55, 960-62) only tells how O&M activities are conducted and presents no impact analysis, and its table of topical headings (AR 966-68) never analyzes impacts at all.  Its discussion of dredging impacts (AR 1104-12) never contrasts them by alternative, preventing informed choice.  Its water quality discussion (AR 1089-91) claims the impacts of each alternative are "similar" but never discusses their frequency or intensity.  The FSEIS (AR 1143-47) never details how either alternative would affect cumulative water quality. Its discussion of revetment (AR 1119-21) never compares revetment impacts between the two alternatives.  And, the FSEIS (AR 1042-1055) never shows the impacts of implementing FWS mandates.  In sum, the Corps' citations (Corps 12-13) fail to clarify the O&M impacts.

Plaintiffs showed the FSEIS dismisses significantly changed circumstances occurring since the Corps prepared its original EISs.  MSJ 17.  The Corps responds that the FSEIS "supports [its] conclusion that . . . continuing actions in the Mississippi did not significantly impact animals living on the river's banks," noting that the Corps no longer scrapes the river bank, and the planform width (the distance from tree line to tree line) has been relatively stable since 1976. Corps 13 n.2, citing AR 1042-43.  But the Corps tacitly admits that it never updated its analysis of terrestrial wildlife.  Consequently, it has failed to consider and discuss changed circumstances despite the population declines plaintiffs have noted, violating NEPA's hard look mandate.

### B.  THE FSEIS' PURPOSE AND NEED STATEMENT IS TOO NARROW

The Purpose and Need Statement is drawn so narrowly only the Project can qualify for

2

approval, eliminating other reasonable alternatives.  MSJ 17-20; AR 947, 963, 972.  The Corps

argues this does not violate NEPA (Corps 13-14), but as shown below this is incorrect.

### 1.  The Purpose and Need Statement Improperly Limits Alternatives.

The Corps agrees the Purpose and Need ("P&N") Statement delimits the scope of reasonable

alternatives.  MSJ 17-18; Corps 13.  Because the P&N Statement assumes only regulating works

can achieve the Project's purposes, the FSEIS only considered the Project, or no Project.  AR

931-932, 947, 972-73.  Consequently, it mandates continued training structure and revetment

construction to reduce dredging costs – regardless of flood risks and ecological impacts – and

disregards less impactful options.  It therefore violated NEPA. *Simmons v. United States Army*

*Corps of Eng'rs*, 120 F.3d 664, 666 (7th Cir. 1997); *National Parks and Conservation Assn. v.*

*Bureau of Land Management* ("*National Parks*"), 606 F.3d 1058, 1070 (9th Cir. 2010).

### 2.  The Purpose and Need Statement Ignores Environmental Laws and the Project's Own Authorizing Legislation.

The P&N Statement asserts "[t]he long-term goal of the Project, as authorized by Congress,

is to obtain and maintain a navigation channel and reduce federal expenditures by alleviating the

amount of annual maintenance dredging *through the construction of regulating works*."  AR 930

(emphasis added), AR 947.  The Corps (13-17) argues this justifies a narrow Statement.  Not so.

The Corps' "statutory authorization to act" sets parameters on the river's width. *Citizens*

*Against Burlington v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991)*; MSJ 5-6, 18, 49-50.  Before

the 1927 RHA, the1881 project contemplated a river width of "about 2,500 feet," and generally a

navigation "channel 8 feet deep and 200 feet wide."  AR 3565, 6955.  The Corps admits "the

1927 RHA modified the Project 'in accordance with the recommendations submitted by the

Chief of Engineers ["Chief"] in [his] letter . . .'"  Corps 14 (quoting 1927 RHA, 44 Stat. at 1012).

The Chief's letter concurs with the Board of Engineers and the District Engineer that the Project

be "changed so as to provide for a channel 9 feet deep and 300 feet wide, with additional width

in the bends . . . ."  AR 46948.  But the Chief clarified that no funds "in excess of the amount

now provided for by the existing project" be approved, except an increase in annual maintenance

costs – including dredging – equal to that requested by the District Engineer.  AR46945-48 (quote), AR 2304.  Thus, the 1927 RHA continued to authorize a project that would contract the river to "a width of about 2,500 feet," while approving a 9 foot deep, 300 foot wide channel.  *Id.*

The Corps' claim that the Chief did not "carry forward" contraction widths included in the District Engineer's report is based solely on the Chief's reluctance to recommend additional *funding* for regulating works when $14,900,000 remained *unspent*.  AR 46948.  He stated "[t]here is a strong probability that a channel 9 feet deep and 300 feet wide can be secured by the works constructed *and contemplated* augmented by dredging."  *Id.* (emphasis added).  He noted that dredging would decrease "as the construction of permanent works of improvement progress," as contemplated in the District Engineer's report.  AR 46948, 45965.  But the Chief and the Board *endorsed* the District Engineer's recommended changes to the Project.  AR 46946-48, 46950-52.  The Chief generally concurred with the Board (AR 46947) that "[t]he results already obtained . . . and a study of the plans proposed by the [D]istrict [E]ngineer show that a continuation of the present method of improvement is well adapted to provide the channel dimensions desired."  AR 46951-52.  Indeed, the Chief's report to Congress following passage of the 1927 RHA states the Project is intended to constrain the river to the same channel widths as those the Corps *now* claims were not adopted in the Chief's letter.  *Compare* AR 46946, 46968 *with* 46937.  Thus, the Chief's reluctance to endorse additional funding did not reject the District Engineer's reasoning or conclusions regarding appropriate channel widths to "approximate[] an average of natural conditions."  AR 46946; 46950.

The Corps' position now contradicts its FSEIS and undermines its P&N Statement further.  If the 1927 RHA adopting the Chief's recommendation is read to authorize only "new work necessary to protect caving banks and to remove shoals in the channel," and not the remainder of the District Engineer's proposal, it would only authorize what was needed in *1925* for those purposes.  AR 46948, 46971.  It would not authorize ongoing construction necessary "to complete regulation of the river" and reduce reliance on dredging.  AR 46971 (quote), 45967-71.

4

Indeed, the Corps' position now directly contradicts the statement in its FSEIS that "[the Chief . . . also concurred in the District Engineer's recommendation that] the regulating works and revetment be completed . . ." to reduce such reliance. *Compare* AR 945 (quote with brackets in original) *with* AR 46947; Corps 15-17.  The Corps' claim that the 1927 RHA rejected the Board and District Engineer's reports would also exclude the District Engineer's recommendation that regulating works and revetment be completed.  The Corps cannot have it both ways.  Its mistaken interpretation of the 1927 RHA to mandate construction of regulating works that narrow the river hundreds of feet beyond the statutory limits (MSJ 49-50) wrongly constrains its P&N Statement.

The Corps also disclaims any need to consider additional Congressional directives in its P&N Statement.  Corps 17.  Instead, the Corps implies that "broad environmental laws or regulations" need not be considered.  *Id.*  For this reason, it relies on Appendix K to compensate for its failure to consider additional directives in its P&N Statement.  *Id.*  But Appendix K – "Regulating Works Project History" – cannot substitute for a sufficient P&N Statement informed by "the views of Congress, expressed . . . in the agency's statutory authorization to act, *as well as in other congressional directives*."  *Burlington*, 938 F.2d at 196 (emphasis added); *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 867-68 (9th Cir. 2004) (agency properly considered Congressional directives in authorizing legislation in setting P&N Statement).

Thus, the Corps was required to consider and incorporate relevant Congressional directives within the WDRAs, and the FWCA in the P&N Statement.  MSJ 18-19.  By ignoring directives establishing that "all water resources projects" should "protect[] and restor[e] the functions of natural systems and mitigat[e] any unavoidable damage to natural systems," and similar relevant laws and regulations, the Corps impermissibly curtailed its P&N Statement.  42 U.S.C. § 1962-3(a)(3) (quotes); 33 U.S.C. §§ 2316, 2283(d); 16 U.S.C. §§ 661, 662; 33 C.F.R. § 236.4.

The Corps' claim that it considered these directives in discussing alternatives does not correct this failing because the Corps still impermissibly curtailed the range of alternatives.  *Vermont Pub. Int. Rsch. Grp. v. U.S. Fish & Wildlife Serv.*, 247 F. Supp. 2d 495, 526 (D.Vt. 2002).

5

Because the FSEIS fails to incorporate these crucial Congressional directives, and longstanding Corps' policy objectives, into the Project's P&N Statement (AR 943-47, 964-65), the FSEIS violates NEPA. *Burlington,* 938 F.2d at 196; *National Parks,* 606 F.3d at 1070-72.

### 3. The Purpose and Need Statement Fails to Demonstrate Project Need

The Corps fails to grapple with its duty to demonstrate public need for the new river training structures, and denies the current dredging regime will continue to maintain the channel. Corps 18; MSJ 19-20; *National Parks*, 606 F.3d at 1071; AR 962-65. It insists that reducing dredging costs is part of its Congressional directive. Corps 18; AR 947. But its misdirection ignores the FSEIS' larger omissions: the Corps cannot point to a comparative- or benefit-cost assessment showing construction of these structures is less expensive than dredging, after accounting for the costs of the flooding and other ecological harms the structures cause. MSJ 20 (citing AR 931-932, 980-85,1261-1273). Instead of addressing the FSEIS's failure to examine future costs with – and without – new training structures, and to identify areas needing continued dredging even with new training structures, the Corps claims its analysis of alternatives sufficed. Corps 18; MSJ 20; AR 980-85. Because the FSEIS fails to address these vital details, it violates NEPA. *Bob Marshall Alliance v. Hodel* ("*Bob Marshall*") 852 F.2d 1223, 1228 (9th Cir. 1988) ("informed and meaningful" consideration of alternatives required).

### C. THE FSEIS IGNORES REASONABLE ALTERNATIVES

The Corps defends its use of the 1927 RHA to limit the FSEIS's discussion of alternatives. Corps 19-20. It is doubly wrong. First, the Corps misstates the Congressional directives that undergird its authority. Its post-hoc interpretation of the 1927 RHA misreads the Chief's recommendations to Congress, and thus the works it authorized. Coupled with its willful disregard for other relevant Congressional directives, the Corps' P&N Statement is too narrow, and improperly constrained the scope of alternatives considered in detail. Its premise that alternatives that did not reduce dredging run counter to its authority is just wrong. Corps 19-20. Second, as shown below, the Corps was required to "include reasonable alternatives not within

the jurisdiction of the lead agency." 40 CFR § 1502.14(c).[1]  Its cramped reading of the 1927 RHA and other Congressional directives led it to improperly curtail the range of alternatives.

### 1. The FSEIS Allows Only a Binary Choice Between the Project and No Project.

An FSEIS that fails to "[r]igorously explore and objectively evaluate all reasonable alternatives" (40 C.F.R. § 1502.14), and provide a "thorough consideration of all appropriate methods of accomplishing the aim of the action" and an "intense consideration of other more ecologically sound courses of action" (*Environmental Defense Fund v. Corps of Engineers,* 492 F.2d 1123, 1135 (5th Cir. 1974)), violates NEPA.  MSJ 20-22.  The FSEIS examines only two alternatives – Continue Construction and No New Construction – and both preserve existing training structures despite their impacts.  AR 972-984.  The Corps points to the three alternatives eliminated from detailed consideration to distract from its error.  Corps 21-22.  But its one-page dismissal of those alternatives leaves the FSEIS woefully deficient.  Corps 21; AR 972-975.

As discussed below, the FSEIS fails to rigorously explore reasonable alternatives that may achieve the primary objective and are not remote or speculative.  *Muckleshoot Indian Tribe v. U.S. Forest Service* ("*Muckleshoot*"), 177 F.3d 800, 810, 814 (9th Cir. 1999); *NRDC*, 458 F.2d at 836.  The two alternatives have similar end results and thus do not represent an adequate range. *State of California v. Block* ("*Block*"), 690 F.2d 753, 767 (9th Cir. 1982).  The enormous scope and impacts of the Project warrant evaluation of a broader range of alternatives than those available when Congress authorized it in 1927.  AR 976-77, 1082-1174; *Alaska Wilderness Recreation and Tourism v. Morrison*, 67 F.3d 723, 729 (9th Cir. 1995); *Sierra Club v. Espy*, 38 F.3d 792, 803 (5th Cir. 1994); *Resources Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1307 (9th Cir.

---

[1]   The Corps argues that alternatives requiring an act of Congress rarely qualify as reasonable. Corps 20.  But here, where Congress has directed the Corps to *change* how it operates in order to account for environmental protections – through the WRDAs and FWCA –  it is reasonable to include alternatives that are tailored to attain those goals, even if Congressional action may be required.  This is *not* "so remote from reality as to depend on, say, the repeal of antitrust laws" as the Corps implies in its failed attempt to distinguish *Natural Resources Defense Council v. Morton* ("*NRDC*"), 458 F.2d 827, 837 (9th Cir. 1972). Corps 20 n. 7.  *NRDC* is on point.

1993).  The Project's new structures and dredging impact 195 miles of the Mississippi River, its flood plain, and hundreds of species that rely on it.  AR 977, 984, 6956, 34528.  Its broad scope, duration and impacts dictate that the Corps evaluate a reasonable range of alternatives, instead of just a binary choice.  *Save Our Cumberland Mountains v. Kempthorne* ("*Cumberland*"), 453 F.3d 334, 345 (6th Cir. 2006).

Because the Corps's two similar alternatives are insufficient under NEPA, it changes tack to erroneously argue that its arbitrary limit is authorized by Congress.  Corps 21-22.  But its cases are distinguishable.  *Izaak Walton League of America v. Marsh* held that where Congress authorized a specific project, "the  . . . agency's obligation to discuss alternatives in its [EIS] is relatively narrow," but that the "rule of reason" still applies.  655 F.2d 346, 372 (D.C. Cir. 1981). There, the rejected alternatives directly "conflict[ed] with the congressional mandate . . . ."  *Id*. Here, the Project *itself* conflicts with Congressional mandates limiting training structures once the river is between 2,000 and 2,500 feet.  MSJ 49-50.  The *omitted* alternatives, by contrast, would protect Congressional intent, and do so using modern, environmentally-friendly methods.

*Burlington* is also distinguishable.  938 F.2d at 197-98.  There, the agency considered both Congressional intent based on recent legislation and local agency needs in expanding a cargo hub, and eliminated alternatives that were not technically feasible.  *Id*.  Here the Corps relies on legislation nearly 100 years old – while ignoring modern mandates to protect the environment – to eliminate feasible alternatives, while incorrectly claiming they require Congressional action.

An alternative may not be disregarded merely because it does not offer a complete solution to the problem, nor because it would require Congressional action.  To the contrary, the EIS must "[i]nclude reasonable alternatives not within the jurisdiction of the lead agency."[2]  The FSEIS'

---

[2]  40 C.F.R. § 1502.14(c); *NRDC*, 458 F.2d at 834-36 (agency had to discuss alternative energy sources, despite legislation finding need for offshore leasing and mandating import quotas, and consider reasonable alternatives to offshore oil lease which might reduce need for offshore exploration, even if it would require new legislation); *Environmental Defense Fund v. Froehlke* ("*Froehlke*"), 473 F.2d 346, 351 (8th Cir. 1974) (acquisition of land to mitigate loss of land from river channel project must be considered even though it would require legislation).

two very similar alternatives violate NEPA's mandate, contrary to Congress' intent.

### 2. The FSEIS Ignores Alternatives Requiring Congressional Authorization

An EIS may not reject an alternative because it would require Congressional authorization. *NRDC*, 458 F.2d at 834-36; MSJ 22-23. Yet, the FSEIS declined to consider alternatives for exactly that reason, including those that: (1) remove or modify existing river training structures; (2) maintain the authorized channel by other means, such as upstream water management, and alternative dredging activities; and (3) propose ecological restoration and fish and wildlife conservation. AR 972-77, 1363-67, 1501-02, 2062-63. All these alternatives would "maintain navigation," minimize dredging, *and* provide long-overdue environmental protection. Corps 23; AR 1133-34. But the FSEIS declines to consider any alternatives the Corps currently deems outside its existing authorization, or that involve methods not specifically identified by Congress a century ago. AR 931, 964, 972. NEPA "prevents federal agencies from effectively reducing the discussion of environmentally sound alternatives to a binary choice between granting and denying an application."[3] Yet that is exactly what the Corps has done here.

The Corps' claim that it "fulfilled its duty to briefly discuss the alternatives it dismissed" does not excuse its separate failure to "[r]igorously explore and objectively evaluate all reasonable alternatives." Corps 23; 40 C.F.R. § 1502.14. The Corps does not refute, and thereby admits, that it never considered any alternative that removes or modifies existing training structures. Corps 23-25. The Corps' brief mention of past structure modification, and potential removal or modification of structures for future mitigation, fails because neither is an alternative to the Project. Corps 25; 40 C.F.R. § 1502.14. The FSEIS' cursory dismissal of alternatives that

---

[3]  *Cumberland*, 453 F.3d at 345, *citing Davis v. Mineta,* 302 F.3d 1104, 1122 (10th Cir. 2002) ("[O]nly two alternatives were studied in detail: the no build alternative, and the preferred alternative. [The agency] acted arbitrarily and capriciously in approving an [environmental assessment] that does not provide an adequate discussion of [p]roject alternatives."); *Colorado Envtl. Coal. v. Dombeck,* 185 F.3d 1162, 1174 (10th Cir. 1999) (NEPA forbids "agencies from defining the objectives of their actions in terms so unreasonably narrow they can be accomplished by only one alternative.").

maintain the channel by other means fails to "rigorously explore" those options.  The Corps'
single-paragraph response to comments on this alternative is neither a rigorous exploration of,
nor a legitimate basis for dismissing, this alternative.  AR 972-73.  The FSEIS cannot ignore
alternatives simply because the Upper Mississippi has water control plans under a different
authority.  40 C.F.R. § 1502.14(c); *NRDC*, 458 F.2d at 834-36; *Froehlke*, 473 F.2d at 351.  That
alternative's impacts must be examined so that the public can compare them with the Project's.

The Corps' attempts to excuse the FSEIS' dismissal of an environmental conservation
alternative because it would require Congressional authorization, or "Congress already rejected"
it, both fail.  Corps 23-24.  Congress' choice to authorize the "Upper Mississippi River
Restoration – Environmental Management Program," rather than to alter the Project's purpose
occurred nearly 40 years ago, unlike the case on which the Corps' relies – *City of Sausalito v.
O'Neill*, 386 F.3d 1186, 1209-10 (9th Cir. 2004) – where Congressional intent was made clear
only four years prior.  Furthermore, in *Sausalito*, the lack of funding for the project was clear and
unequivocal, making the alternative impossible.  *Id*.  Neither of these facts exists here.

*Muckleshoot* further illustrates the point that feasible alternatives must be considered.  177
F.3d at 814.  It held that even an alternative's reliance on "admittedly speculative" resources is
not a reason to dismiss it.  *Id*.  The Corps' attempts to distinguish this illustrative case thus fail.
Corps 24.  Congress' failure to change the Project 40 years ago does not create a bar to updating
that purpose now.  Because there are no insurmountable barriers to achieving a conservation
alternative, and it would serve modern environmental objectives, it may not be ignored.

In sum, the Corps left numerous alternatives unexamined, leaving the public in the dark as to
their impacts and how they compare to one another.  Absent this analysis, the FSEIS fails.

### 3.  The FSEIS Fails to Evaluate a Reasonable Range of Effective Alternatives.

Contrary to the Corps' claims, the FSEIS fails to evaluate reasonable alternatives that achieve
the Project's purpose while reducing its impacts.  MSJ 24; Corps 25.  The Corps does not deny
that the FSEIS never considered any alternative that evaluates restoration activities that would

improve the MMR's ecological health, its flood plain and fish and wildlife that rely on them. *Id.* A viable but unexamined alternative renders an EIS inadequate. *Muckleshoot,* 177 F.3d at 814.

The Corps asserts the FSEIS considered removal or modification of existing river training structures, but that was for "potential compensatory mitigation for future construction," and other ongoing programs only. Corps 25. It does not consider *an alternative* that removes or modifies existing river training structures to restore habitat and reduce flooding while still maintaining navigation. AR 972-78, 1133-34. Nor does it consider *an alternative* that minimizes new structures based on assessment of their impacts. Corps 25; AR 965, 972-75, 2062.

The FSEIS dismisses alternatives that could require any sort of Congressional approval including alternative upstream water level management regimes, alternative dredging and dredged spoil disposal activities, and the development of new, innovative techniques. AR 972-975, 1364-67, 2068-70. The Corps insisted it had to use the obsolete techniques for carrying out the Project that Congress originally approved *110 years ago based on a Corps plan developed 139 years ago*. AR 931, 945, 964, 973, 2297-2329. 999-1001, 1046-47. This deficiency renders the FSEIS inadequate as a matter of law, common sense and modern science.

### 4. The FSEIS Fails to Provide Informed Consideration of Alternatives.

The FSEIS fails to identify and compare the alternatives' locations, costs and impacts. AR 972-83. The Corps claims such important facts are not needed because the FSEIS is programmatic. Corps 26. But the FSEIS's scope does not excuse its failure to provide "informed and meaningful" review. *Bob Marshall,* 852 F.2d at 1228. To the contrary, the Project's broad scope and scientific advancements over the past 139 years only highlight the need for an updated and comprehensive review. *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976).

The FSEIS fails to identify triggering criteria for future dredging, revetment, or river training structures, rendering any impact discussion meaningless. AR 972-79. A theoretical discussion of impacts, with no idea of when, where, or how often they will occur, does not allow informed review. The Corps has been implementing the Project since 1910, and has ample data on these

11

features.  AR 931.  Yet the FSEIS fails to specify the types of river training structures to be built and their location, length and height.  AR 976-78.  But these facts greatly affect flood heights. Without this vital information, impacts cannot be adequately assessed.  AR 6956.

By limiting the project purpose to reducing dredging costs by building more structures, the FSEIS preordains selection of the Continue Construction Alternative even though that alternative will cause more environmental harm.  *Compare* AR 981 (The No New Construction Alternative "[d]oes not achieve Congressionally authorized project objective of reducing federal expenditures by reducing dredging to a minimum") *with* AR 983 ("Based on the Project's Congressional authority . . .  the Continue Construction Alternative . . . is the Preferred Alternative.").  The FSEIS strives to create the illusion that alternatives were thoughtfully analyzed, but the reality is the Corps was hiding the chosen Project up its sleeve the whole time.

### 5.   The FSEIS Fails to Identify the Environmentally Preferable Alternative

The Corps' ROD must "[i]dentify all alternatives considered by the agency in reaching its decision, specifying the alternative or alternatives which *were* considered to be environmentally preferable."  40 C.F.R. § 1505.2(b) (emphasis added).  Identification of the environmentally preferable alternative must therefore occur *before* the ROD issues.  Otherwise, the Corps cannot "specify[] the alternative . . . *considered to be environmentally preferable*" during the review.

This identification is critical so that the public can fully assess the appropriateness of the preferred alternative and compare it with the other alternatives under consideration.  But the Corps did not identify the environmentally preferable alternative in the FSEIS, preventing the public from using and commenting on this until *after* the Corps had issued its ROD.  AR 984.

### D.   THE FSEIS FAILS TO ADEQUATELY ANALYZE PROJECT IMPACTS

### 1.   The FSEIS Ignores Irrefutable Science and Data Showing Project Impacts

### (a) Flood Heights and Flood Response

That floods have occurred on the Mississippi for "many decades" is irrelevant to whether the FSEIS adequately analyzes the impacts of training structures on flooding.  Corps 29-30.  It does

not.  MSJ 28-29.  Overwhelming science and data show a direct causal relationship between narrowing the river's channel and raising the river's height.  AR 1083-84, 1208-29, 1517-21, 1554-58, 1561-68.  Ignoring the information identified in 500 pages of scientific research, the FSEIS's entire discussion of this research is buried in an appendix.  Corps 29-33 (citing FSEIS only once (AR 1083)).  Both those comments and the Corps' response must be in the EIS:

> "'Where scientists disagree about possible adverse environmental effect, the EIS must inform decision-makers of the full range of responsible opinion on the environmental effects.' Where the agency fails to acknowledge the opinions held by well respected scientists concerning the hazards of the proposed action, the EIS is fatally deficient."

*Friends of the Earth v. Hall* ("*Hall*"), 693 F. Supp. 904, 934 (W.D.Wash 1988).  But rather than analyze *why* the Corps reached its conclusions, the FSEIS just asserts "river training structures do not affect water surface elevations at higher flows," despite research showing "that river training structures raise flood heights."  AR 1083.  NEPA requires analysis of data, not bare conclusions.

Moreover, the analysis buried in Appendix A is cursory, dismissive, and false.  AR 1207-37.  The Corps blames its failure to review important data on expert Dr. Nicholas Pinter, claiming he "refused to provide" data and models.  Corps 32.  In fact, Dr. Pinter never refused to provide the Corps with data; he simply required that the analysis be completed by "independent scientific review - independent as defined in the Corps' own guidelines - by a body such as the National Research Council."  AR 22677.  It was the Corps that refused to ensure independent review, "instead relying upon opinions by Corps personnel and examination by . . . paid consultants."  *Id*.

The Corps' failure to include this important expert opinion in the body of the FSEIS, and the subsequent failure to present adequate and accurate information, even in Appendix A, violates NEPA.  "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA."  40 C.F.R. § 1500.1(b).  An EIS may not rely "on conclusory statements unsupported by data, authorities, or explanatory information."  *Id*.

### (b) Sediment Loading and Transport, Hydrology and Hydraulics

Plaintiffs showed the FSEIS lacks essential information on sediment loading, sediment transport, hydrology and hydraulics in the MMR.  MSJ 29-30; AR 1002-1005.  The Corps claims

the FSEIS's response to the IEPR Panel suffices.  Corps 34 (citing AR 7270-90, 995-1025).  Not so.  Because that discussion is obscured by a mis-rendered graphic (AR 1002), the FSEIS fails to provide comprehensible "annual percentages and load from Missouri River and Upper Mississippi River," as the IEPR Panel requested.  AR 6968; 1002-05.  While the FSEIS does include "2013 thalweg bed material averaged by 25-mile reaches," a virtually unreadable chart addressing "changes in suspended-sediment loads" and a graph detailing trends in "median grain size," that is not the comprehensive sediment-load information the IEPR Panel requested.  *Id*.

The Corps fails to respond to plaintiffs' showing that it relied on stale data and ignored the evolved scientific understanding of large river sediment transport and deposition documented in hundreds of published article since the 1976 EIS was finalized.  MSJ 30 (citing AR 37254-343, 27419-480, 1509-10, 1656-57); Corps 34 n.18, 36.  The Corps' omission of this updated data prevents informed public review.  The Corps' claim that plaintiffs "misrepresent the IEPR's comment" on this issue (Corps 35) ignores the fact plaintiffs stated they disagreed with the IEPR Panel's reliance upon the 1976 EIS to fill these gaps.  MSJ 30.  The Corps ignores the FSEIS' admission that the hydraulics and hydrology of the MMR have changed significantly since 1976, in part due to river training structures.  Corps 35; MSJ 30 (quoting AR 997-998); AR 1107 (training structures alter hydraulic patterns).  The Corps' reliance on stale data violates NEPA. *Northern Plains Res. Council v. Surface Transp. Bd.*, 668 F.3d 1067, 1085-86 (9th Cir. 2011).

### (c)  Main Channel Border Habitat Model

Plaintiffs showed the FSEIS's assessment of main channel border habitat is based on an incomplete border habitat model, as it admits "[a]ctual acreages affected would not be known until the main channel border habitat model is completed and is subsequently used to determine impacts on an ongoing site-by-site basis."  MSJ 30-31, quoting AR 1132 n. 23.  This omission violates NEPA, because the Corps was required to provide this information as its cost was not "exorbitant," nor its provision "infeasible."  40 C.F.R. § 1502.22; *Sierra Club v. U.S. Dept. of Transp.*, 962 F. Supp. 1037, 1043 (N.D. Ill. 1997).  This failing is critical, as the Project will add

14

to the already devastating loss of 34.85% of this habitat in the MMR.  MSJ 31, citing AR 1132 (6,900 acres of habitat lost since 1976).  The Corps claims it need only "state that the information is unavailable" when the cost of providing it is exorbitant, but it makes no showing that the cost was exorbitant here.  Corps 38; 40 C.F.R. § 1502.22.  Since it failed to make that showing, it "shall include the information in the [EIS]."  40 C.F.R. § 1502.22(a).

### (d) Nineteen Mile Modeled Reach

Plaintiffs showed that the FSEIS omits critical information on the model the Corps used to estimate the Project's impacts on the 19-Mile Reach – and for its entire analysis of the Project.  MSJ 31-32 (citing AR1122-1124).  Plaintiffs requested 11 categories of essential information to assess the model's adequacy (AR 1511-1512), which the Corps failed to provide.  *Id.* (citing AR 1122-1125, 2071).  The FSEIS therefore violated NEPA's "hard look" mandate.  *Id.* (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332,  356 (1989); *North Carolina Wildlife Fed'n v. North Carolina Dept. of Transp.*, 677 F.3d 596, 605 (4th Cir. 2012)).

The Corps contends it "described the model's results, validated the model and the study results, and added the model study report to Appendix J," and thereby complied with NEPA.  Corps 39.  But its refusal to provide the information plaintiffs requested belies this claim.  Requesting basic information needed to evaluate this model is not "flyspecking" as the Corps asserts.  *Id.*  It is a reasonable, common sense request the Corps should have honored.  The Corps' discussion of the model's *output* (Corps 40) does not excuse its failure to disclose its underlying assumptions and methodology, which are essential to evaluate the model's fitness.

The FSEIS' discussion of the Project's impacts on main channel border habitat failed to (1) describe the basic ecological characteristics of this habitat, (2) identify the vast majority of fish and wildlife species that utilize this habitat, (3) discuss the 2004 study that shows this habitat is preferred by the endangered Pallid sturgeon, and (4) discuss impacts to reptiles, as a 2016 study showed it was "most important to reptiles."  MSJ 38-39.  The Corps ignores point (1), and tacitly concedes points (2) that it omitted the vast majority of the impacted species, (3) that it failed to

15

address the 2004 study without explaining why other unidentified studies supposedly cured this omission, and (4) regarding reptiles yet claiming the Project increases turtle habitat without citing any supporting study and contradicting itself by admitting the Project "would result in conversion of estimated 8% (1,100 acres) of remaining unstructured [i.e., natural] main channel habitat to structured, leading to . . . loss of shallow to moderate-depth . . . main channel border habitat" – which is exactly the shallow habitat that turtles use.  Corps 41, citing AR 982.

### (e) Independent External Peer Review Panel Comments

The FSEIS does not address all the IEPR Panel's criticisms, rendering it "fatally deficient." MSJ 32 (citing AR 6477-6903 and *Hall*, 693 F.Supp. at 934).  The Corps admits "[t]he IEPR Panel raised several concerns about the Draft SEIS," but contends the FSEIS addressed each. Corps 34-35.  It states "the IEPR Panel concurred" in the Corps' claim that the future "quantity, location and types of structures" was "unknowable" due to the MMR's "dynamic nature," and that the Corps "significantly expanded" the SEIS to provide additional sediment information.  *Id*.

But these responses do not address all of the IEPR Panel's criticisms.  MSJ 32.  The Corps did not revise the SEIS to address the first, and most important, Panel criticism that:

1. It is not clear why impacts of future river training structure construction and the associated compensatory mitigation requirements were not evaluated in more detail with respect to specific locations in the MMR.

MSJ 32, citing AR 6957; AR 671 ("non-concur").  The importance of this criticism cannot be gainsaid.  It is impossible to evaluate the direct, indirect and cumulative impacts of the Project, and any potential mitigations, without knowing *where* the river training structures will be sited.

Instead, the Corps agreed only to include some of the requested information in *future site-specific EAs*  (AR 672 ("Not Adopt")), defeating NEPA's purpose of providing sufficient information *in the EIS* to educate the public regarding the location, size and timing of new river training structures *before* the programmatic decision to continue to build them is made.  *Block*, 690 F.2d at 761-765; *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1072 (9th Cir. 2002); 40 C.F.R. § 1502.5.  The Panel's apparent acquiescence in the Corps' refusal to provide this

essential information in the FSEIS (AR672) does not excuse the Corps' separate NEPA violation.

### 2.  The FSEIS Fails to Accurately Establish Baseline Conditions

Plaintiffs showed seven reasons why the FSEIS's presentation of baseline conditions violated NEPA:  it refused to consider credible information connecting existing river-training structures to increases in flood heights; and omitted sedimentation data, data on fish and wildlife and critical habitat, plant species, habitat types, channel cutoffs, and the ecological decline of the River caused by regulatory works.  MSJ 33-35.  The Corps defends its deficient analysis, claiming it need not present any environmental baseline data.  Corps 35, n. 20.  But sufficient baseline information is needed to assess the environmental impacts of the alternatives.  *Oregon Nat. Desert Ass'n v. Jewell* ("*Jewell*"), 840 F.3d 562, 568 (9th Cir. 2016); *Half Moon Bay Fishermen's Mktg. Ass'n. v. Carlucci*, 857 F.2d 505, 510 (9th Cir.1988); *Friends of Back Bay v. U.S. Army Corps of Engineers*, 681 F.3d 581, 588 (4th Cir. 2012).  The Corps claims its exclusion of flood-height data that cuts against its conclusions was a "reasoned judgment" entitled to deference.  Corps 36.  But cherry-picking baseline flood-height data obscures the impact of training structures on flooding, preventing assessment.  The Corps' refusal to allow an independent third-party to review Dr. Pinter's data (AR 22677) was not an expert judgment entitled to deference but instead an arbitrary one that tainted the FSEIS.  *Jewell*, 840 F.3d at 570.

The Corps contends it provided sufficient baseline sedimentation data in response to the IEPR Panel Recommendations.  Corps 34, 36.  But much of this discussion is unreadable, and thus cannot inform the public about the existing baseline sediment conditions.  AR 1002 (text obscured by graphic), 1002-1005 (sediment information).  And the discussion that is legible is so vague as to be useless.  *Id.*  Thus it fails to provide the hard look at impacts that NEPA requires.

The Corps relies upon its "3-D Numerical Hydraulic Model" to substitute for baseline fish, wildlife, and plant habitat and population conditions.  Corps 38 (citing AR1121-1136, 2138-2296).  But neither that model nor the "list of analyses to be included in the SEIS" (AR 10261-10262 (capitalization altered)) addresses these topics.  The Corps maintains that it was not

17

required to fill these informational gaps.  Corps 37-38.  But these gaps were not the result of the Corps' "lack in certainty of application" nor "scientific 'disagreements,'" as the Corps claims. *Id.* (citing *Sierra Club v. Marita*, ("*Marita*") 46 F.3d 606, 623 (7th Cir. 1995).  Unlike in *Marita*, where the agency disagreed about the usefulness of conservation biology to assess the project's impacts to forest diversity, here the Corps has simply failed to provide or determine actual baseline conditions for fish and wildlife species and their critical habitat, plant species including wetland species, and important habitat types throughout the 195-mile Project area.  The Corps' model of less than twenty river miles designed to study depth and velocity characteristics is no substitute for this vital biological information.  AR 1121; *Jewell*, 840 F.3d at 568-570.  The Corps was required to obtain this information, absent "exorbitant" cost.  40 C.F.R. 1502.22(a).

The Corps claims it took a "hard look at the potential impact of channel cutoff at a programmatic level," and its mention of Len Small Levee satisfied any need to address Dogtooth Bend.  Corps 36-37.  Not so.  First, the Corps' denial of a causal connection between training structures and channel cutoffs (Corps 36 n.21) is irrelevant to the need for a baseline discussion where, as here, the Corps' action includes bank stabilization measures to prevent cutoffs from occurring.  AR 977, 979.  Second, the Corps' mention of the Len Small Levee – in its purpose and need discussion – fails to address continuing cutoff concerns at Dogtooth Bend after repair work was completed.  *Compare* AR 961-962 *with* AR1546-1552.  The changes to the FSEIS did not present a reasoned discussion of the baseline condition at that location.  *Id.*

Last, the baseline fails to address the impact of existing activities on the overall significant decline in the River's ecological health.  MSJ 34-35.  The Corps states its cumulative impacts discussion, including its admission that past actions "'likely significantly adversely affected some segments of the MMR . . . ,'" constitute a sufficient hard look at the regulating work's contributions to the "alleged decline in the MR's health."  Corps 37 (quoting AR 1169, citing 1143-1169).  But this cumulative impacts analysis does not analyze baseline conditions.

The Corps' failure to accurately present the baseline environmental conditions prevented it

18

from taking the required hard look at the Project's impacts on them.  *Jewell*, 840 F.3d 568-570.

### 3. The FSEIS Fails to Adequately Evaluate Flooding Impacts

River training structures increase flood heights and alter the way the MMR responds to high water events.  AR 1083-1134, 2073-2074, 8395, 11801-11802, 12047-12048, 12051.  These structures have increased flood heights by up to 15 feet.  AR 12051, 22143-22168, 22569-22582.  The impact of increased flood heights on main channel border habitat is "significant on technical, institutional, and public merits."  AR 978.  The FSEIS's failure to acknowledge this fact  renders it dangerously flawed.  Dr. Pinter's research, published in the *Journal of Hydraulic Engineering* and elsewhere, specifically rebuts both the methodology and conclusions in the Watson studies, on which the Corps relies.  AR 1561-1569.  That research shows that impacts compound as more structures are built.  AR 11801-11802, 12047-12048, 12051.  These impacts are borne out in the public's intense opposition to new training structures, due to their flood risks.  AR 1483-2054.

Dr. Criss likewise confirms that training structures increase flood levels.  AR 8395.  A 2016 *Journal of Earth Science* study he co-authored ("Criss and Luo 2016") concludes the MMR is flooding more frequently and severely, "primarily [as a] result of extreme channelization of the river" from training structures.  AR 9851.  Rather than re-evaluating the Project to address these concerns, the Corps disparages these well-respected, knowledgeable experts to make its own poorly reasoned conclusions appear legitimate.  *See* § I.D.1.a above.  But it is the Corps – and its illogical conclusions – that cannot withstand scrutiny.  Indeed, Dr. Pinter *requested* that his work be reviewed by an independent panel, and the Corps refused.  AR 22677.  Because it refused to include and discuss these well-supported scientific facts in the FSEIS, the Corps violated NEPA.

### 4. The FSEIS Fails to Evaluate Side- and Back-Channel Impacts

The Corps claims its failure to evaluate side- and back-channel impacts is justified by its conclusion that "training structures . . . do not impact this habitat."  Corps 43-44.  But the record refutes this.  The FSEIS's discussion of *existing* side channel restoration efforts reveals that removal or alteration of training structures improves side-channel depth and connectivity.  AR

19

1020-1021.  Further, during the period when the Corps claims that side-channels have been "very stable . . . with very little change occurring . . . ," half the side channels for which information is available have become shallower, and many side channels have disappeared.  Corps 43 (quote); AR 1021-1022.  Yet the FSEIS assumes that any impact of new training structures, including reductions in river stage caused by them, would be "minor and inconsequential."  AR 1087.  This assumption is counter to the record, and no substitute for the required hard look.

Likewise the Corps failed to address climate-change-associated Project impacts on side and back channel habitat during high-flow conditions, even as it briefly considered that climate change could exacerbate the Project's low-water impacts on the quantity and connectivity of side-channels.  Corps 43 n. 25; AR 1100.  The Corps cites the FSEIS' section on affected environment to claim it took a hard look at back- and -side channel impacts to pallid sturgeon.  Corps 43 (citing AR 1044-50).  But this broad survey of activities the Corps is undertaking pursuant to FWS' 2000 Biological Opinion does not provide a hard look at the impacts of training structures on pallid sturgeon habitat in side and back channels.  *Id.*  And while the Corps *now* relies upon conclusions in the  Eliza Point/Greenfield Bend Regulating Works Project Environmental Assessment ("EA") to backstop this omission (Corps 43), the FSEIS only incorporates that EA by reference for its cumulative impacts analysis.  AR 1142.  Since that EA considers any construction impact to the pallid-sturgeon habitat to be localized, it does not account for the full impact of the Project.  AR 14048.  The information in this separate, localized EA is simply no substitute for the hard look at the *entire* Project required in the FSEIS.

## 5.   The FSEIS Fails to Meaningfully Evaluate Mitigation

The Corps fails to meaningfully evaluate, and provide details regarding, mitigation.  MSJ 41-42.  The Corps claims the FSEIS's programmatic nature excuses these omissions.  Corps 44-46.  Not so.  The Corps must provide sufficient information to show "environmental consequences have been fairly evaluated" – regardless of the scope of the agency's approval.  *Robertson*, 490 U.S. at 333; *Neighbors of Cuddy Mountain v. U.S. Forest Service*, 137 F.3d 1372, 1380 (9th Cir.

1998); *South Fork Band Council v. U.S. Dept. of Interior*, 588 F.3d 718, 727 (9th Cir. 2009); MSJ 41-42. The Corps mistakenly disregards these cases due to the FSEIS's programmatic nature. Corps 44. The Corps ignores *Wyoming Outdoor Council v. U.S. Army Corps of Engineers*, 351 F. Supp. 2d 1232, 1252 (D. Wyo. 2005) (MSJ 41), which makes clear that, even for broad programs, an agency fails to take a hard look if its discussion is not supported by evidence that mitigation would be effective. Instead, citing *Wilderness Soc'y v. BLM*, 822 F. Supp. 2d 933, 944 (D. Ariz. 2011), the Corps claims its mitigation discussion was sufficient, as no site-specific analysis was required where no site-specific projects were approved. Corps 45. But there the "FEIS includes discussions of the effectiveness of [the] mitigation measures in its analysis of . . . environmental impacts." 822 F.Supp.3d 943. The FSEIS failed to do so here.

The Corps relies upon brief discussions of potential changes to existing training structures (AR 1134), potential compensatory mitigation (AR 975), and future mitigation planning (AR 984) as a substitute for including a sufficient mitigation plan and evaluation of its environmental consequences in the FSEIS. Corps 45. But none of the Corps' citations addresses whether future mitigation will successfully reduce impacts, and thus the FSEIS does not take a hard look.

## II.   THE CORPS VIOLATED THE WATER RESOURCES DEVELOPMENT ACT

The Corps violated WRDA because it failed to prepare a detailed mitigation plan as required by 33 U.S.C. §§ 2283(a)(1) and (d)(1) to reduce the Project's adverse impacts to wildlife resources. MSJ 42-45. The Corps argues it had no duty to prepare a mitigation plan, claiming section 2283(a)(1) "applies only to projects that had not commenced construction on November 17, 1986," and "the Project has been in construction for over 100 years." Corps. 46. This interpretation ignores this section's language expressly *including* projects authorized "*before*, on or after November 17, 1986," which forecloses exemption of previously authorized projects. The Corps also ignores the fact that its challenged approval occurred, and the approved construction will occur, more than three decades *after* the November 17, 1986, trigger date. The Corps' stated purpose of its SEIS was to provide a factual basis for its decision whether – decades after

21

Congress' trigger date – to approve a broad new phase of construction to install "approximately 4.4 million tons (2.9 million cubic yards) or rock" for hundreds more river training structures over the next several decades, or instead, to "*not* construct[] any new river training structures." AR 2-3 (emphasis added).  If deciding whether to approve this enormous project was not the purpose, then the entire exercise – preparation of the FSEIS, its circulation to the public, and the submission of thousands of good faith comments by federal agencies, states, organizations, and members of the public – was mere shadow play, rendering the entire process a charade.

The Corps argues in the alternative that it did prepare the required mitigation plan, but it fails to show compliance with Congress' very precise roadmap directing what this detailed plan must contain.  Corps 46-49.  Section 2283, subsections (a)-(d) set forth specific steps the Corps must take, and enumerate detailed components the required plan must include.  MSJ 42-44.  But instead of arguing it complied with these mandates, the Corps advances implausible and irrelevant post-hoc rationales for its omissions.  Corps 47-49 (claiming difficulty in providing the mandated mitigation details instead of showing it provided them).  Its argument therefore fails.

## III.    THE CORPS VIOLATED  THE FISH AND WILDLIFE COORDINATION ACT

The Corps violated the FWCA by failing to conduct detailed consultation with the FWS to "determin[e] . . . damage to wildlife resources and . . . means and measures that should be adopted to prevent" that damage, and include those recommendations as "an integral part" of the FSEIS.  MSJ 45 (quoting 16 U.S.C. § 662(b)).  The Corps argues the Project is exempt because it was "over 60% complete when the Act was passed in 1958,"  and alternatively, it "satisfied any consultation required by the FWCA by consulting with [FWS]."  Corps 49 (citing 16 U.S.C. § 662(g)).  The Corps is wrong on both counts.  The FWCA,  the Corps' regulations, and FWS's FWCA Handbook all state that the section 662(g) exemption does not apply when "the authorized plan is modified or supplemented" after 1958, as occurred here.  MSJ 46-47.  The Corps' claim that "the Project was not significantly changed since 1927" fails because "[t]he Project authorized in 1927 was substantially modified in 1934, 1965 and 1974."  MSJ 47, citing

22

AR 2303-2311.  In 1965, the Corps changed the Project to maintain navigation year round including winter when the lowest flows typically occurred, and in 1974, the Corps adopted a plan to contract the channel width to 1500 feet.  *Id*.  At the same time, "because of the shift from pile dikes to stone dikes as well as the increase in linear feet of dike and revetment work . . . during the 1960's and early 1970's, . . . *the estimated percentage completion of the Regulating Works Project was reduced below 60% to 48% in the 1973 Chief of Engineers Annual Report."*  MSJ 47, quoting AR 2307-2311 (emphasis added).  The Corps ignores these substantial changes in the Project since 1958 and its dispositive admission that "the estimated completion of the Regulating Works Project was reduced below 60 %."  *Id.*

The Corps' claim that it adequately consulted fails because it admits it did not prepare "a formal FWCA report."  Corps 50-51.  None of its cases excuses its violation of FWCA's mandate that recommendations from the consultation "shall be made an integral part of any report prepared or submitted" by the Corps to Congress.  16 U.S.C. § 662(b).  In *Confederated Tribes and Bands of the Yakima Indian Nation v. F.E.R.C.*, 746 F.2d 466, 470-477 (9th. Cir. 1984), the court set aside the Federal Energy Regulatory Commission's relicensing of a dam because FERC failed to conduct additional environmental studies and consultations required by the Federal Power Act ("FPA"), the FWCA and NEPA.  The court's "resolution of this case on the FPA question ma[de] it unnecessary to discuss . . . [the] FWCA . . . in detail."  *Id.* at 473. Therefore the court did not address the FWCA's specific consultation requirements.

In *Texas Committee on Natural Resources v. Marsh*, 736 F.2d 262, 268 (5th Cir. 1984), the court held neither NEPA nor the FWCA required the Corps to adopt the FWS' mitigation recommendations so long as "[t]he Corps considered the recommendations of the USFWS and articulated its reasons for rejecting those recommendations."  The court did not address the FWCA's specific consultation requirements at issue here.  In contrast to the Corps' refusal here to consider any alternative to the Project other than its rejection, in *Marsh* the Corps had afforded "comprehensive treatment" to five different alternatives to address the project's impacts.  *Id.* at

23

268, fn. 7.  *Texas Committee* provides no support for the Corps' position.

In *Froehlke*, 473 F.2d at 348-356, the court held the Corps' EIS on a river channelization project violated NEPA because "neither agency decision-makers . . . nor the Congress were presented . . . with sufficient information to make an intelligent decision about proceeding with the project or awaiting the effectuation of a mitigation plan."  *Id.* at 352.  Since the court found flagrant NEPA violations, it deemed it unnecessary to consider the Corps' alleged violations of the FWCA, except to note that the FWCA "does require other governmental agencies, including the Corps, to coordinate their activities so that adverse effect on fish and wildlife will be minimized."  *Id.* at 356.  The Corps failed to do that here.  MSJ 15-49.

In *Missouri ex rel Ashcroft v. U.S. Army Corps of Engineers*, 526 F.Supp. 660, 677 (W.D. Mo. 1980), the court held the Corps had complied with a flood control act, NEPA, and the FWCA.  It stated that under the FWCA, "federal agencies proposing to modify the waters of any stream must 'consult with the [FWS],' 16 U.S.C. § 662(a), . . . give 'full consideration' to reports by concerned federal and state agencies on the wildlife aspects of the project," and "'include such justifiable means and measures for wildlife purposes' as are necessary to maximize project benefits.'"  *Id.* at 677.  It ruled the Corps had complied with those duties, in part because it had complied with NEPA.  *Id.*  The Corps did not discharge those duties here.

The Corps argues it consulted fully with the FWS because it circulated the draft and final SEISs to FWS, "'considered the recommendations of the USFWS and articulated its reasons for rejecting those recommendations.'"  *Id.* at 51-52, quoting *Texas Committee,* 736 F.2d at 268.  But the Corps overlooks the fact that here, its SEIS was inadequate, and its responses to FWS' comments deficient, confirming the need for an FWCA report addressing and proposing mitigation for the Project's impacts on fish and wildlife under that Act.  MSJ 15-49.

## IV.    THE CORPS VIOLATED THE 1927 RIVERS AND HARBORS ACT

The Project as amended by Congress in the 1927 R&H Act ("RHA") limited "[c]onstriction of the channel through regulating works and revetment . . . to a conservative width of 2,500 to

24

2,000 feet at low water," and directed that "after completion of regulating works, dredging be continued, as needed, to maintain a channel 9 feet deep and 300 feet wide with requisite increased width at bends . . . ." MSJ 49 (quoting 1926 Chief's Report at ¶¶55-57, 80, 84). It explicitly rejected even narrower contraction of the river, directing that once the river was contracted to a width of 2,000 to 2,500 feet (depending on location), the Corps was to maintain the navigation channel through dredging as needed. *Id*. Thus the Corps' approval of the FSEIS with its 1,500 feet contraction (AR 1-6, 2309) exceeds Congress' authorization.

The Corps claims the District Engineer's report plaintiffs cited was "rejected" by the Chief. Corps 53. Not so. As explained on page 4, *supra*, the Chief's letter *concurred* in the Board of Engineers' and the District Engineer' recommendations that the Project be "changed so as to provide for a channel 9 feet deep and 300 feet wide, with additional width in the bends . . . ." AR 46948. But he clarified that no funds "in excess of the amount now provided for by the existing project" should be authorized, except for an increase in annual maintenance costs – including dredging costs – *equal to that requested by the District Engineer*. AR46945-46948 (quote), *see also* AR 2304. Thus, the 1927 RHA continued to authorize a project that would contract the river to "a width of about 2,500 feet," while approving modifications for a 9 foot deep, and 300 foot wide channel. *Id.* The Chief's reluctance to endorse additional funding did not reject the District Engineer's reasoning or conclusions regarding appropriate channel widths to "approximate[] an average of natural conditions." AR 46946; 46950. The Corps' argument contradicts the FSEIS and its P&N Statement. AR 945, 46947-46948, 45967-46971. The Corps' claim that the 1927 RHA mandates the Project even though it narrows the river hundreds of feet beyond the statutory limits therefore fails. MSJ 49-50.

## CONCLUSION

For these reasons, the Corps violated NEPA, WRDA, FWCA, and the RHA.

Dated: June 30, 2021                   Respectfully submitted,
*s/ Stephan C. Volker*
STEPHAN C. VOLKER (pro hac vice)
ALEXIS E. KRIEG (pro hac vice)

25

STEPHANIE L. CLARKE (pro hac vice)
JAMEY M.B. VOLKER (pro hac vice)
LAW OFFICES OF STEPHAN C. VOLKER
1633 University Avenue
Berkeley, California 94612
Tel:    510/496-0600  Fax:   510/845-1255
Email:  svolker@volkerlaw.com
akrieg@volkerlaw.com
sclarke@volkerlaw.com
jvolker@volkerlaw.com


BRUCE A. MORRISON
GREAT RIVERS ENVIRONMENTAL LAW CENTER
319 North Fourth Street, Suite 800A
St. Louis, Missouri 63102
Tel:    314/231-4181  Fax:   314/231-4184
Email:  bamorrison@greatriverslaw.org

Attorneys for Plaintiffs NATIONAL WILDLIFE
FEDERATION, AMERICAN RIVERS, PRAIRIE RIVERS
NETWORK, MISSOURI COALITION FOR THE
ENVIRONMENT, and GREAT RIVERS HABITAT
ALLIANCE