IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

NATIONAL WILDLIFE FEDERATION, AMERICAN
RIVERS, PRAIRIE RIVERS NETWORK, MISSOURI
COALITION FOR THE ENVIRONMENT, and
GREAT RIVERS HABITAT ALLIANCE,

Plaintiffs,

vs.                                                                Case No. 20-cv-00443-DWD

UNITED STATES ARMY CORPS OF ENGINEERS,
LT. GENERAL SCOTT A SPELLMON, Commanding
General and Chief of Engineers, MAJOR GENERAL
DIANA M. HOLLAND, Commander of the
Mississippi Valley Division of the Army Corps of
Engineers,

Defendants.

## MEMORANDUM AND ORDER

**DUGAN, District Judge:**

This matter comes before the Court on the Plaintiffs' Motion for Summary Judgment (Doc. 34) and the Cross Motion for Summary Judgment filed by the Defendants. (Doc. 40). Plaintiffs consist of organizations dedicated to protecting the environment. (They are herein referred to collectively as "NWF"). NWF seeks this Court's review of the United States Army Corps of Engineers' ("Corps") Record of Decision ("ROD") approving its 2017 Regulating Works Project ("Project") and Final Supplemental Environmental Impact Statement ("FSEIS") on the Project's River training structures, including dikes, weirs, chevrons and bank hardening revetments ("regulating

1

works") and related operations and maintenance ("O&M") activities. (Doc. 34-1). Defendants in contrast seek determination that they have fully complied with the requirements of a variety of laws governing the Corps' activities related to the management and training of the Middle Mississippi River. ("MMR") (Doc. 40).

STANDARD OF REVIEW

This matter was instituted with the Plaintiffs' Complaint wherein they seek on administrative review a declaratory judgement that, generally, the Corps' ROD and FSEIS in 2017 was capricious and not in accordance with applicable laws. (Doc. 1, P. 94). Plaintiffs also seek injunctive relief. The parties have filed and briefed their respective motion for summary judgement. No party suggests that there are any remaining issues of material fact.

While a motion for summary judgment is a proper vehicle to bring to the court a factually undisputed controversy, the standard under Federal Rule of Civil Procedure 56 is not the same as that to be applied on administrative review.  This Court's review of the Corps' action under The National Environmental Policy Act of 1969, 42 U.S.C. § 4321, *et. seq.* ("NEPA"), is governed by the Administrative Procedure Act ("APA"). *Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 952 (7th Cir. 2003). The APA instructs courts to set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or it is "without observance of procedure required by law." 5 U.S.C. § 706(2)(A) and (D). Under this standard, although a reviewing court's

2

inquiry is "searching and careful ... the ultimate standard of review is a narrow one." *Mineta,* 349 F.3d at 952 (citations and quotations omitted).

A Court reviewing agency action is concerned primarily with whether the agency's decision was based on a consideration of the relevant factors and whether the agency has made a clear error in judgment. *Id.* at 952–53. "If an agency considers the proper factors and makes a factual determination on whether the environmental impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference." *Id.* at 953. In the context of NEPA, arbitrary and capricious review prohibits a court from "substitut[ing] its judgment for that of the agency as to the environmental consequences of its actions." *Id.* (citing *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, (1976)). "In fact, in applying the arbitrary and capricious standard, this Court's only role is to ensure that the agency has taken a hard look at environmental consequences." *Env't L. & Pol'y Ctr. v. U.S. Nuclear Regul. Comm'n*, 470 F.3d 676, 682 (7th Cir. 2006)

## BACKGROUND AND HISTORY

The historical overview of the MMR, man's efforts to maintain and control the River over the past two centuries, and Congress' legislative endeavors to ensure that a balance is struck between the River's continued commercial navigability and the preservation of the regional ecological systems, associated resources, and wildlife, are largely undisputed by the parties.

The MMR consists of a 195-mile length of river between the Missouri River just above St. Louis, and its confluence with the Ohio River at the southern tip of Illinois.

3

(Doc. 34-1, P. 1). In its entirety, the Mississippi River Watershed drains 1,245,000 square miles – approximately one-third of the continental United States – including all or parts of thirty-two states and two Canadian provinces. (Doc. 34-1, P.5). It supports vast tracts of bottomland forest, wetlands, and aquatic habitats, and more than 300 species of birds, 57 species of mammals, 45 species of amphibians and reptiles, and 150 species of fish. *Id.* (AR 27950). The river supplies water to nearby and even somewhat distant populations, and, importantly, provides for a highly utilized means of commerce. Myriad communities of citizens along and nearby its flow depend on, not just the preservation of its ecological diversity and splendor, but also the River's capacity to allow for the continuation and even expansion of commerce.

In addition to its characteristic meandering flow, in the early 1800s, the River's width varied significantly from as much as 7,000 feet to as little as 4,000 feet, and the channel ranged width from 3,600 feet to as narrow as 125 feet, with depths varying between 3 to 7 feet. (*See* AR 2297-2329, Exhibit K, for historical synopsis of the uses and difficulty with training of the River during the 19th Century). Not that long ago, parts of the MMR remained very shallow and wide, and not fit to move deep draft and cargo-ladened vessels. To utilize the River, some level of control of it became necessary. But the MMR is not entirely manageable and seems to resist its management in places. The River, from time to time, ignores man's desires and purposes for it, and overflows its banks from an abundance of water, shallows from a want of water, and through erosion and accretion, changes its course and depths from the force of water.

4

Some might suggest that complete management of such a natural force is a bit of a fool's errand. However, the effort is viewed by Congress as necessary, and, beginning in 1824, it authorized the Corps to make improvements to the Mississippi River "for the purpose of obtaining and maintaining an inland navigation channel for waterway commercial transportation throughout the United States." (AR. 942). By 1881 the Mississippi River Commission, organized by an act of Congress, had formulated a plan to maintain navigability of the River by use of a system "of contraction, thus compelling the river to scour out its bed, this process being aided, if necessary by dredging." According to the Corps, by 1910, Congress authorized the ultimate plan for how the navigation channel should be obtained and maintained for a majority of the MMR and eventually established the current navigation channel dimensions of 9 feet deep and not less than 300 feet wide, with additional width in the bends as required in 1927. (AR 944-943). The consensus in the first decades of the 20th Century was to further its commitment to dredging as the primary tool to maintain suitable channel dimensions.[1]

Dredging proved to be less effective than hoped for, in part, due to the deposits of additional sediments from the Missouri confluence just north of St. Louis City. According to the Corps, the "dredging experiment" failed, so Congress constituted a special Board of Engineers to study the problem and determine the best way to maintain a navigable

---

[1] The Corps believes that Congress directed that the MMR's "appropriations were to be used first for dredging and whatever funds remained could be applied to the construction of permanent improvements". (AR 2301).

5

channel of suitable dimension. The Board "determined that an eight-foot channel would be sufficient for the MMR given the current amount of commerce, and such a depth would be best obtained and maintained through construction of permanent improvements, with dredging being used as a supplement to permanent improvements". (App. K-6; AR 2302). Congress authorized the Board's recommendations in the Rivers and Harbors Act dated June 26, 1910, which restored the 1881 MMR navigation channel project to be obtained and maintained through bank stabilization, the construction of regulating works, and rock removal. *Id.* But demands placed upon the River by commercial traffic sharply declined in the second decade of the 20th Century due to higher use of railways and the United States' entrance into World War I which caused a reduction in the availability of men to manage loading and unloading at the docks along the River. As a result, Congress reduced funding to a point that construction of new works halted, and even existing structures began to degrade for want of attention and repairs.

However, in 1924 the bourgeoning navigability issues with the River began worsening and this came to the attention of Congress which requested the Board of Engineers for Rivers and Harbors study the feasibility of creating and maintaining a nine-foot deep and 300-foot wide channel below St. Louis.   In 1926, the Board advised Congress that "interruptions to the work of contraction, due to reliance upon dredging, and meager appropriations" occurred between 1910 and 1925. (AR2303). The Corps points to this 1926 report for the proposition that "without sufficient permanent

6

improvements, navigation could only be maintained by dredging and 'it is impracticable to maintain a dredging fleet sufficient in number of dredges to safeguard the required depth at each bar." *Id.* The engineer who authored that report, Maj. Gotwals, stated that "at many of the crossings where continuous dredging was necessary in the past the regulating works have provided an adequate channel where no dredging is now necessary." (AR 2303). He added that "[a]lthough great benefits have resulted from the work already done, it is essential that additional regulating works and bank protection be carried to a point where minimum dredging is required and a stable channel is available at all times." *Id.* Maj. Gotwal's recommendation also observed that "the regulating works and revetment be completed and that dredging, which affords only temporary relief, be resorted to only when and to the extent that the needs of navigation then existing require." *Id.*

Support for the construction of regulating works in the MMR waxed and waned, tending to reflect economic concerns and realities more than beliefs as to the efficacy of the Project. During the depression, and into the 1940s, efforts to train and dominate the River expanded significantly, in some measure due to the efforts of Congress to stimulate a stagnate economy. However, in the 1950s, regulating works construction came to a complete halt, resulting in uncompleted work and unrepaired structures. By the early 1960s, growing environmental awareness and the need to temper progress with consideration, mitigation and, where necessary, avoidance of actual and potential harm

to affected ecosystems made its way to those in Congress, resulting in the passing of landmark legislation for the protection of our environment in 1969.

## THE NATIONAL ENVIRONMENTAL POLICY ACT

With the passage of The National Environmental Policy Act of 1969, 42 U.S.C. § 4321, *et. seq.*, "Congress established the nation's central and unique environmental policy for (self-) regulating the federal government." *Simmons v. U.S. Army Corps of Engineers*, 120 F.3d 664, 666 (7th Cir. 1997). For all "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C), federal agencies must articulate why they have settled upon a particular plan and what environmental harms (or benefits) their choice entails. *Id.* More specifically, the responsible official within the agency must provide a detailed statement reflecting (i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented. 42 U.S.C.A. § 4332(2)(C).

The primary purpose of an environmental impact statement required by § 4332 is to ensure agencies consider the environmental impacts of their actions in decision making. 40 C.F.R. § 1502.1. Accordingly, every time an agency prepares an environmental impact statement, it must answer three questions in order. First, what is the purpose of

the proposed project? Second, given that purpose, what are the reasonable alternatives to the project? And third, to what extent should the agency explore each particular reasonable alternative? *Simmons* at 668.

NEPA does not, however, mandate that an agency reach any particular decision, only that the agency follows NEPA's procedures to arrive at an informed decision. *Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,* 435 U.S. 519, 558 (1978). It is therefore well-settled that even environmentally harmful projects will satisfy NEPA as long as the appropriate procedures are followed. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989). In that sense, the rights NEPA provides are procedural, not substantive. *Yankee*, 435 U.S. at 558. In a nutshell, "NEPA mandates a searching inquiry into alternatives, but says nothing about which to choose." *Simmons*, 120 F.3d 664, 666. "It binds federal officials to justify their plans in public, after a full airing of alternatives. It thus blends a faith in technocratic expertise with a trust in democracy. Officials must think through the consequences of —and alternatives to—their contemplated acts; and citizens get a chance to hear and consider the rationales the officials offer." *Id* (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)). "But, if a federal agency has heard all the objections to a plan and considered all the sensible options before it, the agency has fulfilled its duty." *Id*.

### PLAINTIFFS' ALLEGATIONS OF NEPA VIOLATIONS

As mentioned above, the Corps discharges its statutory duties for the MMR through its Regulating Works Project.  In 2017, the Corps adopted the ROD approving its

2017 Regulating Works Project and Final Supplemental Environmental Impact Statement ("FSEIS") on the Project's River training structures, including dikes, weirs, chevrons and bank hardening revetments and related operations and maintenance activities.  The FSEIS supplements the Corps' Environmental Impact Statement which was completed in 1976.

Plaintiffs allege a variety of deficiencies in the Corps' FSEIS and consequent violations of NEPA. Generally, Plaintiffs suggest that the FSEIS (1) ignores the impacts of O&M activities (Doc. 34-1, P. 26); (2) its Purpose and Need is too narrow (Doc. 34-1, P. 27); (3) it ignores reasonable alternatives (Doc. 34-1, P. 30); and (4) fails to adequately analyze project impacts. (Doc. 34-1, P. 37). The Court will address each in turn.

## A. The Corps' O&M Activities Along the MMR

NWF complains that the FSEIS of May 2017 does not properly address the Project's operations and management activities, including revetments, dredging and spoils disposal. NWF argues that the impact of the continued dredging, whether under the present operations or pursuant to the proposed construction alternative, must be reevaluated for alternatives. (Doc. 34-1, P. 17). The Corps responds indicating that NWF mistakenly relies on an impact summary table (AR. 980), and points to evidence that the Corps did, in fact, consider and analyze dredging impacts. A review of the FSEIS reveals that the Corps considered and discussed the effects of dredging on water quality and turbidity, the downstream transport of contaminants, such as heavy metals and organics (AR. 1144-1146), Benthic Macroinvertebrate resources, fishery resources, entrainment of fish during dredging, habitat (AR. 1104-1111), noise (AR. 1108-1109, 1112), and air

pollution. Further, the Corps, in keeping with interagency Tier considerations, looked to and considered the biological opinions of the National Fish and Wildlife Service and its recommendations for emergency dredging limitations and monitoring in the effort to protect indigenous fish species. (AR 1050).

Next, NWF contends that the FSEIS should discuss "the significant changes [since 1976] in the river's ecological conditions, the many changes in environmental laws and policies mandating greater environmental protections, and scientific advances in understanding the Project's impacts." (Doc. 34-1, P. 17).  Indeed, a new "hard look" and supplementation of the FSEIS can become necessary "where there are new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9. The Corps responds to NWF's complaints by stating that, in fact, "[t]he entire point of the FSEIS was to supplement the 1976 EIS due to new circumstances." (Doc. 40-1, P. 13).

The record reveals that the Corps believed that it was appropriate to supplement the 1976 EIS "due to the amount of the new information and circumstances that could affect the Project's impacts." (AR. 963). The FSEIS identifies a litany of "new circumstances", including, to highlight just a few: new federally protected species of fish and wildlife, new programs to restore populations of fish and wildlife, information on the impact of training structures, the impact of dredging, and technological information obtained from 3-D hydraulic models and studies of geometry and geomorphology to determine channel shape and characteristics over time. (AR 964-967). The FSEIS also

11

provides updated information on a variety of subjects including the MMR river channel, configuration and stages, water quality, air quality, aquatic and endangered species, cultural elements, effect of maintenance dredging, and impact of O&M on navigation channel and water quality. Further, the FSEIS identifies information found in the 1976 EIS that it still considers relevant and which it determined no updated information needed to be supplied. (AR. 965; *see also* Table 1-2 at AR. 966-968).

A review of the record reveals that the FSEIS does not ignore the impacts of O&M Activities. Rather, it demonstrates that a thorough investigation into the environmental impacts of the Project and alternatives was conducted. Still, there are conceivable circumstances and conditions that are present within and along the MMR that are not discussed or developed to NWF's liking, but there is no requirement under NEPA that every aspect of a project be studied *ad nauseum* or that all negative impacts of the project be eradicated.

## B. THE FSEIS AND ITS PURPOSE AND NEED STATEMENT

Next, the NWF complains generally that the Purpose and Need Statement contained in the FSEIS is too narrow such that "only the Project as proposed can qualify for approval, and other reasonable alternatives are eliminated" (Doc. 34-1, P17).  NWF further argues that FSEIS ignores environmental laws and authorizing legislation (Doc. 34-1, P. 18), and fails to demonstrate project need. (Doc. 34-1, P. 19). More to the point, NWF's criticism is that the statement effectively mandates continuation of the river

training structure and revetment construction to reduce dredging costs, regardless of flood risks and ecological impacts. (Doc. 34-1, P.18). In response, the Corps points out that the purpose and need is dictated by Congress' directive to maintain the MMR's navigation channel by using regulating works, with minimal supplemental dredging. The Corps adds that incorporating Congress' directives into the FSEIS's purpose and need statement did not violate NEPA. (Doc. 40-1, P. 14).

All "major Federal actions significantly affecting the quality of human environment" warrant a statement discussing the impact of the action. The requirement that there be a purpose and need statement serves "to ensure agencies consider the environmental impacts of their actions in decision making."  40 C.F.R. § 1502.140; C.F.R. § 1502.3; 42 USCA § 4332(C). The Council on Environmental Quality ("CEQ") regulations require that an agency preparing the statement "shall briefly specify the underlying purpose and need for the proposed action." 40 C.F.R. § 1502.13. The purpose and need statement "necessarily dictates the range of 'reasonable' alternatives." *Carmel–By–The–Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997); *see also Van Abbema v. Fornell*, 807 F.2d 633, 638 (7th Cir. 1986) (reasonableness of a particular statement of purpose and need depends on both the nature and general goal of the project itself). In the end, the statement of a project's purpose and need is left to the agency's expertise and discretion, and Courts defer to the agency if that statement is reasonable. *Alliance for Legal Action v. FAA,* 69 Fed.Appx. 617, 622 (4th Cir. 2003).

13

In its "Purpose of and Need for Action" statement (AR 943), the Corps points to Senatorial records dating back to 1881 when the Mississippi River Commission ("MRC") declared that "the system to be pursued is that of contraction, thus compelling the river to scour its bed; this process being aided, if necessary by dredging." (AR 945; Senate Executive Doc. 10, 47th Congress, 1st Session). The Corps further indicates that in the Rivers and Harbors Act of 1910 Congress authorized obtaining and maintaining the MMR to be carried out in accordance with the 1881 MRC plan. *Id.* In the statement, the Corps also suggests that the Rivers and Harbors Act of 1927, which changed the authorized depth and width of the navigation channel, was based upon the Chief Engineer's Report which provided, in part: "it is essential that additional regulating works and bank protection be carried to a point where a minimum of dredging is required and a stable channel at all times . . . and that the regulating works and revetment be completed and that dredging, which affords only temporary relief, be resorted to only when and to the extent that the needs of navigation then existing require." *Id.*

While the overarching purpose of the project — keeping the channel navigable — may be universal along the MMR, the needs for each specific location are not. Several sites require recurrent dredging, producing millions of cubic yards of dredging material. (AR 959). These sites have proven to be more troubling and difficult to manage which translates into higher site-specific costs. The statement goes on to describe the differing needs at various locations along the MMR and how a reduction in the amount of dredging over the last few decades was attained by the installation of revetments and

training structures. (AR 959; 955). And, important to NWF's argument, the statement also reminds that it is appropriate to consider the economic impact of dredging because the purpose of the Regulating Works Project is to fulfill its goal of keeping the authorized channel navigable, but "with a goal of reducing costly dredging". *See* 40 C.F.R. § 1502.22 (AR 955). It points as well to the need for continued bank stabilization in certain locations through revetment construction and maintenance because unprotected banks along the MMR have historically experienced an annual erosion rate of as much as 10 feet. (AR 960). The Corps believes that the purpose and need of the project are better realized at certain locations along the MMR by less dredging and more training of the channel. And, while NWF may disagree with the Corps' belief, it is clear that the Purpose and Need statement at issue here meets the requirements of NEPA. 40 C.F.R. § 1502.140; C.F.R. §1502.3; 42 USCA § 4332(C).

Still, the NFW complains that the statement improperly limits alternatives. More specifically, NWF alleges that the "[b]ecause the FSEIS' Purpose and Need Statement assumes that only regulating works can achieve the Project's purposes, the FSEIS only considered two options: the project, and no project." (Doc. 34 at 27). Relatedly, NWF asserts that the statement "effectively mandates continuation of river training structure and revetment construction to reduce dredging cost, regardless of flood risks and ecological impacts, and disregards other less impactful alternatives." (Doc. 34-1 at 28). The Court disagrees.

It is true that how an agency fashions its Purpose and Need Statement can naturally include certain alternatives to the project while excluding others. And, certainly, an agency may through inventive articulation "contrive a purpose so slender as to define competing reasonable alternatives out of consideration" and thereby defeat the very underpinnings of the NEPA. *Simmons* 120 F. 3d 664, 666. NWF is concerned that the Corps' Purpose and Need Statement does just that. But there is nothing in the record that meaningfully supports the argument that the Corps tailored its Purpose and Need Statement to limit alternatives solely for the purpose of reducing costs even at the expense of the flood risks and negative ecological impacts. Here, the paramount goal for the Corps is to maintain a navigable waterway along the MMR, and there are a limited number of ways to accomplish this goal. One is to dredge. But dredging can be accomplished in numerous ways. Another is to construct training structures. Likewise, there are many types of structures that have and can be used to accomplish the purpose. The FSEIS discusses the numerous methods, and their known relative impacts on the river bottom and the general ecology along the MMR. Nevertheless, without identifying a specific alternative, NWF goes on to argue that the FSEIS fails to "rigorously explore and objectively evaluate all reasonable alternatives". (Doc. 134 at 31). However, as detailed further below, this argument is also unpersuasive.

## C. The FSEIS and the Corps' Consideration of Alternatives

An agency's EIS "should present the environmental impacts of the proposed action and the alternatives in comparative form based on the information and analysis

16

presented in the sections on the affected environment and the environmental consequences." 40 C.F.R. § 1502.14. Specifically, the EIS must evaluate and discuss in detail reasonable alternatives to the proposed action, identify the no-action alternative discussed, identify the agency's preferred alternatives, identify appropriate mitigation measures, and limit consideration of alternatives to a reasonable number. Condensed, "the evaluation of 'alternatives' mandated by NEPA is to be an evaluation of alternative means to accomplish the general goal of an action." *Simmons v. U.S. Army Corps of Engineers,* 120 F.3d 664, 669 (7th Cir. 1997). An agency need not examine every conceivable alternative. Identifying, assessing, and comparing alternatives costs time and money, *see Metropolitan Edison v. People Vs. Nuclear Energy*, 460 U.S. 766, 776 (1983), and an agency should focus its energies only on the potentially feasible, not the unworkable. 40 C.F.R. §§ 1502.14(a)–(c), 1508.25(b)(2); *Simmons*, at 669.

NWF asserts that the FSEIS is contrary to settled law in that it failed to consider other alternatives such as (1) removal or modification of existing training structures "to restore backwater, side channel, and braided river habitat"; (2) upstream water level management regimes; (3) "an alternative that proposes ecological restoration and fish and wildlife conservation." (Doc. 34-1, at 33). While restoration of connected water river habitat, ecological repair, and conservation are all unarguably noble purposes and certainly appropriate for consideration by the Corps, NWF fails to point to evidence that would suggest that these are reasonable alternative methods to ensure the maintenance of a navigable waterway along the MMR.

17

Nevertheless, the record demonstrates that the Corp did not ignore reasonable alternatives. Here, the Corps did consider and address the proposed alternative of "altering water releases from the Upper Mississippi." (AR 972). The Corps indicated that the "locks and dams in the Upper Mississippi River have water control plans that address and maintain those particular projects' purposes under that authority". (AR. 972-973). The FSEIS also considers the efficacy of such a measure and found that "it was shown during the drought in 2012 that the impact of these alterations was not substantial enough to consider this as a reasonable alternative." (AR 972). Further, the FSEIS found that "ceasing all operations and maintenance activities on the Project was not considered [a] reasonable or feasible alternative due to the fact as it would not . . . [provide] a safe and dependable 9-foot navigation channel." (AR 974). It likewise addressed the proposed alternative of constructing locks and dams but it "was not considered a reasonable or viable alternative because it . . . was beyond the scope of the purpose of the SEIS to update the 1976 SEIS" and would require new Congressional authority to even be studied. (AR 974).

Contrary to NWF's assertion to the Court, the Corps also considered and addressed NWF's proposals that involved the removal of training structures to improve habitat. The FSEIS provides a detailed analysis of the effect of chevron dikes (AR 1117), bend way weirs (AR 1118), and revetments (AR 1119) on riverbank erosion and loss of habitat. (AR 1117-1136). The FSEIS also recognizes that the use of training structures will have impacts on fish, wildlife and habitat, and it specifically considered the removal and

18

modification of existing training structures as mitigation measures: "[M]any of the structures were designed by engineers without the assistance of modern numerical and physical model studies that are now used to optimize structure locations, configurations and spacing, etc." such that "opportunities now exist within the MMR to remove, shorten, notch, or otherwise alter configuration of existing river training structures." (AR 1133-1134). The Corps' consideration of NWF's proposals were much more than cursory reviews and this Court believes they were given a "hard look" sufficient to meet NEPA requirements.

NWF also argues that "an alternative may not be disregarded merely because it would require additional Congressional authorization" and that the Corps violated this "settled law" when it declined to consider alternatives that require Congressional approval. (Doc. 34-1 at 33-34). NWF cites to the case of *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999) in support. The Court believes that NWF reads *Muckleshoot* expansively and more broadly than is reasonable. In *Muckleshoot*, the Court expressed its concern that the agency there declined to consider an otherwise reasonable alternative because it believed that the funds to support it were speculative, while, at the same time, the agency did consider other alternatives that were also dependent on arguably speculative funding. In short, the Court was "troubled by this selective willingness to rely upon the availability of funding sources beyond the [agency's] direct control." *Id.* However, nothing in *Muckleshoot* suggests that for each alternative an agency must be declined congressional authority before it may discard it

19

as being unreasonable. Little imagination is required to foresee the enormity of hurdles for all agencies if that was the law.  All agency progress to fulfil the purpose of its very existence would come to a halt while congressional approval was sought.[2] NWF fails to offer, and the Court is unable to find, anything within NEPA that would require that heightened level of scrutiny for each proposed alternative.

## D. THE FSEIS AND PROJECT IMPACT ANALYSES

Next, NWF lodges myriad complaints regarding, in its view, the shortcomings of the FSEIS in its analysis of the impacts of the project. (Doc. 34-1, 37). More specifically, NWF alleges that the FSEIS ignores science and data regarding the project's impact on flood heights and response, sediment loading, transport, and related hydrology, that the Corps improperly relied on defective and inadequate border habitat models, and that the FSEIS fails to meaningfully evaluate mitigation. (Doc. 34-1, Pp. 37-51).

The EIS "should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public" 40 C.F.R. 1502.14.[3]

--------

[2] According to the Corps, it did seek modification of the Project's purpose to include structures to benefit aquatic resources, restoration of ecosystems, to no avail. *See* 33 USC §652(c) (declining to authorize recommendations); *see also* AR 2312-2318 for a discussion of the legislative history of the Water Resources and Development Act, 33 U.S.C. § 652.

[3] This section was amended effective September 14, 2020. It now provides, in pertinent part, "[t]he alternatives section should present the environmental impacts of the proposed action and the alternatives in comparative form based on the information and analysis presented in the sections on the affected environment (§ 1502.15) and the environmental consequences (§ 1502.16). *See* 40 C.F.R. § 1502.14.

Thus, NEPA requires an agency to consider and address in its EIS the anticipated environmental impact of not only the chosen project plan, but also those of the reasonable alternatives. The relative reasonableness of the chosen plan as well as those alternatives not chosen, can be accomplished by examining the environmental impact of each. This process of comparison lends itself to ensure that the chosen plan is weighed in the light of full public disclosure and involvement which furthers the goals of NEPA. But Congress' mechanism to attain those goals is largely procedural in that it requires that the agency take a "hard look" at the environmental consequences of reasonable alternatives. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (NEPA "does not mandate particular results," but "simply provides the necessary process" to ensure that federal agencies take a "hard look" at the environmental consequences of their actions). While the Corps did not comport its decision with the wants of NWF, this Court believes that the Corps did take a sufficiently hard look at the Project's impacts.

Many of the contentions advanced by NWF are planetary to a central argument that the Corps ignored available scientific advances and knowledge. But it is here that NWF conflates an outright refusal to consider science with a rejection of a contentious proposition after it is given due consideration. NWF maintains that the Corps "ignores overwhelming science and data showing a direct and irrefutable causal relationship between narrowing the river's channel due to Project training structures and raising the river's height." (Doc. 34-1, P. 38-39). Specifically, NWF complains that the Corps ignored studies conducted by local university professors, Pinter and Criss. (Doc. 34-1, P. 39). This

21

is simply incorrect. Appendix A to the FEIS entitled "Effects of [River Training Structures] on Flood Levels" is clearly arranged in such a fashion so as to highlight and consider countering points of view, studies, and observations on the issue of whether or to what degree training structures contribute to flooding. (AR. 1207-1238). The FSEIS analyzes numerous highly technical studies conducted by a variety of scientists and addresses some of the advantages and shortcomings of each. (AR. 1212). The relevant work of Pinter and Criss and the Corps' criticisms of their methodology and findings are discussed in detail.[4]

Also, in Appendix A are references to and consideration of other pertinent studies. (AR 1212, 1226-1228). The Corps' criticisms of these studies focus on inaccurate, incomplete, and irrelevant data, along with data analysis observed by studies conducted after Pinter's. The conclusions reached in Pinter's 2001 study are far from "irrefutable" and even today there is no "overwhelming scientific consensus" as NWF asserts. (Doc. 34-1, P. 45). In 2009, another study determined that Pinter's 2001 study failed to demonstrate that the relationship between stage trends on the MMR and dike construction is statistically significant. Nevertheless, the Corps also considered new

---

[4] As the Corps points out, the notion that training structures induce flooding along the MMR is not new. It has been studied and considered previously. In fact, in what is commonly referred to as *NWF I*, *National Wildlife Federation v. United States Army Corps of Engineers*, 2014 WL 6685235 (S.D. Ill. Nov. 24, 2014) this Court, Judge David Herndon (Ret.), considered the issue of whether injunctive relief was appropriate to prevent construction of any new river training structures in the Upper Mississippi River System. There too NWF argued that Dr. Pinter's studies conclusively demonstrated that river training structures increase flood levels. Since the time of the decision in *NWF I*, Dr. Pinter has conducted further studies. The Corps gave consideration to those new studies in Appendix A.

competing bodies of work that address possible correlations between training structures and flooding. (AR 1214-1216). The Corp then analyzed those works that found a positive correlation by assessing the methods and approaches used in each and found a variety of errors. Thus, the Corps did not ignore the science of flooding as NWF suggests; rather, the Corps simply rejected Pinter's understanding of it. There is an obvious divergence in opinion as to whether training structures bring about increased flooding, and while NWF may subscribe to those studies that find correlation, the FSEIS and Appendix A illustrate that the Corps fulfilled its obligation under NEPA to take a hard look at the science that addresses that question.

### E. THE INDEPENDENT PEER REVIEW PANEL'S COMMENTS & RECOMMENDATIONS

NWF next contends that the Corps failed to address comments and recommendations from an independent external peer review panel. Specifically, the Corps submitted a draft of the SEIS to an Independent External Peer Review panel ("IEPR"). The purpose of the IEPR is to ensure that the Corps' "documents are supported by the best scientific and technical information" and to "strengthen the quality and credibility" of the Corps' decision documents by reviewing the "soundness of the project study's assumptions, methods, analyses and calculations." (AR. 704). The IEPR made four recommendations in response to the SEIS draft. NWF represents that "contrary to NEPA, the Corps never addressed these recommendations." (Doc. 34-1. P42). This too is incorrect because, as the Corps points out, it addressed each recommendation of the IEPR and incorporated them into the FSEIS. (AR 670-80) Specifically, the Corps concurred with

some of those recommendations and incorporated corresponding changes to the FSEIS, particularly on the issues of types of structures to be used. Likewise, after the Corps provided its explanations in response to the IEPR recommendations, the IEPR panel concurred with the Corps' explanation. (AR 672). Further, when the IEPR panel recommended that the draft SEIS should include a revision to include information on sediment properties, the Corps expanded Chapter 3 of the SEIS accordingly (AR 677). These volleys of ideas, criticisms, explanations, and compromises illustrate here that the purposes of the NEPA directed at ensuring both unfettered public participation and independent procedural oversight have been served.

NWF also complains that the FSEIS lacks essential information on sediment loading, sediment transport, hydrology and hydraulics of the MMR. (Doc. 34-1. P. 39). More specifically, NWF argues that "the FSEIS does not reflect up-to-date science because it omits essential data and analysis on current sediment loading, sediment transport, hydrology and hydraulics." (Doc. 34-1, P. 40). In support of this argument NWF represents to the Court that the "IEPR Report also *concluded* that 'the SEIS has little information on the hydraulic and hydrologic engineering data for the MMR.'" (emphasis added) (Doc. 34-1. P. 40). However, NWF's reference is not only incomplete, but also misleading. A reading of the entire referenced sentence leaves no room for anything but the conclusion that the information available was adequate. The sentence in its entirety reads: "Although the SEIS has little information on the hydraulic and hydrologic engineering data for the MMR, the 1976 EIS on the MMR was reviewed for this data and

it was found to be complete and suitable for SEIS review." (AR 6964). The adequacy of data and information make up the mainstay for a realistic "hard look" and allegations of inadequate data and information naturally suggest arbitrary decision making on the part of the agency. Here, quite contrary to the representations of NWF, the IEPR panel found the applicable data to be complete. Further, the Corps did not act arbitrarily when it looked to hydraulic and hydrological engineering data from 1976. Accordingly, the Court finds that the Corps adequately addressed in a responsive and thorough manner the concerns and recommendations raised by the IEPR.[5]

## F. THE MAIN CHANNEL BORDER HABITAT MODEL

NWF complains that the Corps' modeling lacks adequate supporting data and information. Specifically, NWF challenges the Corps' use of the Main Channel Border Habitat Model and the Nineteen Mile Modeled Reach.  NWF asserts that the Main

---

[5]The Court is concerned with the lack of candor on some of the issues raised by NWF and representations made to this Court about the content of the record. It is worthy of note that the record in this matter consists of over 49,000 pages. The issues raised on review here, as with most any case brought for review under the ARA, requires a delving into the record. Apart from the large volume of documents contained in the record, NEPA cases become particularly burdensome because the analysis often takes the Court into a highly technical realm requiring a development of specialized knowledge.  Any lack of candor on the part of counsel as to the contents of the record is particularly offensive because it requires the assignment of additional resources to check and recheck the record to test the veracity of counsel's representations. Mischaracterizing the contents of the record or omitting important or operative terms contained in a sentence in the record violates the lawyers most basic duty to a tribunal – the duty of candor. While advocacy always demand zeal, both are secondary to the attorney's duty of candor and truthfulness. *United States Dep't of Hous. and Urban Dev. v. Cost Control Mktg. & Sales Management of Va., Inc.,* 64 F.3d 920, 925 (4th Cir.1994) ("a lawyer's duty of candor to the court must always prevail in any conflict with the duty of zealous advocacy"); *United States v. Shaffer Equip. Co.,* 11 F.3d 450, 458 (4th Cir.1993) ("the lawyer's duties to ... advocate vigorously are trumped ultimately by a duty to guard against the corruption that justice will be dispensed on an act of deceit").

Channel Border Habitat Model is incomplete and that the Nineteen Mile Modeled Reach fails to address the locations, types and extent of river training structures to be deployed by the Project. (Doc. 34-1, P. 40-42). The Corps recognized that "[a]n acceptable habitat model is not available to assess habitat quality for key [Main Channel Border] habitat" and that such a model "is needed to better understand how river training structures impact shallow to moderate-depth, moderate-to high-velocity habitat." (AR 394).

The Main Channel Border Habitat Model was initiated by the Corps to assist in future impact assessment and mitigation planning by focusing on "the specific aspects of the main channel border habitat that this Project impacts." It was "[d]ue to the lack of existing models [that] the District made the decision to develop a new model that would adequately represent the key MMR habitat variables adversely affected by river training structure construction" (AR 397). To that end, the Corps chose to utilize the Sturgeon Chub Model that is intended to help quantify the effects of river training structure construction and modification on the quality of Sturgeon Chub habitat. *Id*. Additionally, the Sturgeon Chub Model is to be "used to evaluate the project actions that impact key variables in main channel border habitat of the MMR." *Id*. Nevertheless, NWF contends that "[b]y relying on an incomplete study without sufficient justification the Corps failed to take the hard look that NEPA requires" and that the "model should have been completed and certified before it was used to assess impacts." (Doc. 34-1, P. 41 and 42).

In *Sierra Club, Illinois Chapter v. U.S. Dep't of Transp.,* 962 F. Supp. 1037 (N.D. Ill. 1997) the court considered whether that agency's description of a project was excessively

narrow when the agency relied on a single population forecast to analyze whether to build a roadway. *Id* at 1043. The court determined that "when there is incomplete or unavailable information as to the impact of a proposed action, and that information is essential to make a reasoned choice among alternatives, NEPA requires an agency to make clear in the final impact statement that the study was not undertaken and that there are reasons the study was not undertaken." *Id*.; *see* 40 C.F.R. § 1502.22. Here, the Corps recognized the lack of specific knowledge regarding certain impacts of training structures, disclosed that fact publicly, and then conducted a three-day interagency workshop with the U.S. Fish and Wildlife Service, the Missouri Department of Conservation, the Illinois Department of Natural Resources, and experts in the fields of model development, fisheries biology, river ecology, river hydraulics, and river maintenance to develop an effective model. (AR 399). Toward the certification of the use of the Sturgeon Chub Model, a team of independent reviewers were then consulted, their comments and recommendations were considered, and in some cases, integrated by the Corps. (AR385; 412-433). Clearly, the Corps did not ignore the need for a workable model to address channel border habitat, nor did it fail to make the lack of new comprehensive study or model known. Rather the Corps reasoned that because the MMR is uniquely varying and dynamic, it is appropriate to study each future construction site independently and apply parameters of existing and developing models to each such site.

The Nineteen Mile Modeled Reach was created as a means of programmatic analysis because "it was not feasible to model the entire MMR due to budget, time and

technological restraints." (AR 1121). However, the Corps considered a 19-mile stretch of the MMR near Chester, Illinois which the Corps believes is representative of the entire 195-mile MMR because it "contains the majority of the structure and habitat types in the MMR, has good bathymetric (data regarding submarine terrain) and is of an appropriate length for maximizing data output and minimizing computation requirements." (AR 1122). The Corps developed the Nineteen Mile reach model to analyze otherwise unknowable impacts on channel border habitat because it concluded that "continued conversion to structured main channel habitat is expected to have a significant adverse effect on the MMR fish community, and . . . may warrant compensatory mitigation." (Doc. 40-1, P. 51; AR 1132).

The FSEIS also addressed the difficulty in projecting with certainty the best location of training structures throughout the MMR:

> One of the recurring challenges with determining the future impacts of implementation of the Regulating Works Project on the human environment is the fact that the exact locations of future work sites and the exact structures to be used are not known. Given the dynamic nature of the MMR, work sites are developed on an ongoing basis as dredging issues arise and the set of structures to be used to address dredging issues at each location is developed based on the unique characteristics of each site. Because of these uncertainties in location and configuration of future structures, it was necessary to use existing dike fields within the modeled reach to serve as surrogates for work sites to estimate future impacts.

(AR 1123).

Because this is an ongoing project the environmental impacts of which, according to the Corps, have been forecasted as much as current technology allows, deference to

the insight and expertise of participating Corps engineers, biologists, and scientists, together with those in agency partnership with them, is warranted.  This Court finds that, under the circumstances reflected in the record, it is not necessarily arbitrary for an agency to defer site specific impact and mitigation analysis until the exact project sites can be identified, particularly when faced with a constantly changing and inhomogeneous theatre of project operation, such as the MMR.  According to the record, the need for maintenance of the depth and breadth of the channel has historically varied along the river and there is nothing to suggest that has changed. As the Corps alludes to, natural changes in flow volume and velocity alters the course of the banks and substrate through a constant process of erosion and accretion sometimes in unpredictable ways such that forecasting exact site locations along the 195-mile stretch is not practicable. It must be kept in mind that the Corps has the Congressionally imposed obligation to maintain a navigable waterway. At the same time, it must examine and analyze all reasonable means and alternatives with constant consideration of the impact that each pose to our environment. True, the determination to defer identification of future worksites is not ideal. However, the Corps was neither arbitrary nor capricious in reaching its decision to defer site-specific analysis and mitigation and utilize an existing model to determine the efficacy of placement of river training structures.

In sum, Plaintiffs' allegations concerning NEPA violations are unpersuasive, and the Court finds that the Corps complied with its requirements under NEPA, and none of the Corps' decisions related to the alleged NEPA violations were arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with the Administrative Procedures Act.

ALLEGED VIOLATIONS OF THE WATER RESOURCES DEVELOPMENT ACT

NWF also claims that the Corps violated the Water Resources Development Act ("WRDA") by failing "to prepare a detailed mitigation plan". Specifically, NWF points the Court to 33 U.S.C. §§ 2283(a)(1) and 2283(d)(1).  Section 2283(d)(1) provides:

> (d)(1) After November 17, 1986, the Secretary shall not submit any proposal for the authorization of any water resources project to Congress in any report, and shall not select a project alternative in any report, unless such report contains (A) a recommendation with a specific plan to mitigate for damages to ecological resources, including terrestrial and aquatic resources, and fish and wildlife losses created by such project, or (B) a determination by the Secretary that such project will have negligible adverse impact on ecological resources and fish and wildlife without the implementation of mitigation measures.[6]

---

[6] Once again NWF's counsel has been misleading in its argument. Significantly, NWF does not accurately and completely recite the language found in § 2283(d)(1). This may explain why counsel does not argue for and simply skips by any interpretation of that provision. (*See* Doc. 34-1, P. 52 and Doc. 43, P. 28-29). Specifically, NWF found it appropriate to omit the part of the statute that refers to such reports as those that are to be submitted as a proposal to Congress. Nothing in this section specifically refers to EIS, SEIS or FSEIS. While statements of fact and arguments lacking candor are always troubling, the extensive record and complex issues presented in this case made NWF's disingenuous statements even more burdensome for the Court.  And, while the Court recognizes the passion of the Plaintiffs and their supporters for the work that they do to protect the environment and wildlife, their cause is not, in the end, furthered by misrepresentations of the law and contents of the record. Such ignoble conduct, though for noble purposes, never wins the day. Counsel is cautioned to thoroughly review Federal Rule of Civil Procedure 11.  Future disingenuousness of this magnitude will not be tolerated by the Court and may result in sanctions. See, e.g., *Matter of Hendrix*, 986 F.2d 195, 201 (7th Cir. 1993) (In deciding whether a lawyer has engaged in sanctionable conduct, courts look to the rules of professional conduct and Rule 11).

A reading of Section 2283(d)(1) reveals that it addresses only proposals for authorization of water resources in reports to Congress. And, while Section 2283(d)(1) might have been more succinctly articulated, this Court disagrees that its language is ambiguous or that it is susceptible to more than one *reasonable* interpretation. *See Hammer v. United States Dep't of Health & Hum. Servs.*, 905 F.3d 517, 528 (7th Cir. 2018) ("we cannot ignore the plain meaning of the statute because Congress could have, arguably, made the statute's meaning even plainer"); *Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 416 (2012) ("the mere possibility of clearer phrasing cannot defeat the most natural reading of a statute"). The mere ability of a party to conceive of any meaning other than the clear meaning of a statute does not render it ambiguous for interpretation purposes.

Giving the words used in Section 2283(d)(1) their usual and customary meaning reveals a sentence structure that cannot support a reading other than that Congress decided to require reports submitted to *it*, either as a proposal for authorization or as an alternative to the project, to contain a mitigation plan unless the impact is negligible. To assume, as NWF does here, that the word "report" which is used in the very narrow sense (reports to Congress) and that in the same sentence Congress assigned to it an all-encompassing and universal meaning (reports of all kinds including statements of environmental impact) does not create a basis for ambiguity. Subscribing to NWF's assumption would require this Court to travel, in the search for Congress' meaning, beyond the borders of the statute itself. *See United States v Great Northern Ry,* 287 US 144, 154 (1932). The natural reading of the statute leaves no room for a finding that it is

susceptible to the interpretation NWF assumes. Regardless, even if Section 2283(d)(1) is ambiguous in the context NWF describes, an application of standard rules of construction would not change the result.

As with all questions of statutory construction, the proper place of beginning is the statute itself. But statutory language "cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016) (citing *Roberts v. Sea–Land Services, Inc.*, 566 U.S. 1350, 1357 (2012)); *see also United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) ("Statutory construction, however, is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme-because the same terminology is used elsewhere in a context that makes its meaning clear."). And a court's "job is to interpret the words consistent with their ordinary meaning." *Wisconsin Cent. Ltd. v. United States,* 138 S. Ct. 2067, 2070 (2018)

The word "report" as a noun can and does have a number of commonly understood meanings attached to it, the differences being dependent most often on the context being used. *See* https://www.merriam-webster.com/dictionary/report (last visited January 10, 2022) ("a story in a newspaper or on radio or television that is about something that happened or that gives information about something"; "a written or spoken description of a situation, event, etc."; "an official document that gives information about a particular subject."). Giving it its ordinary, everyday meaning the

word "report" might well include an "EIS" because the EIS conceivably can be argued to have some characteristics of a report in that it conveys to the public information regarding an impending major federal action. The "primary purpose" of an EIS "is to ensure agencies consider the environmental impacts of *their action in decision making*". 40 CFR §1502.1 (emphasis added). However, NWF fails to point to a single instance where "EIS" or "ROD" is used interchangeably with the term "report" so as to suggest that when Congress uses one it intends that the other be included as well. Moreover, "Environmental impact statement" is a technical term of art born of and defined within the NEPA. 42 U.S.C.A §4332. An often looked to canon of interpretation that is applicable here recognizes that when the law is the subject, the *legal meaning* is to be expected which often differs from the common meaning. *See* Scalia & Garner, *Reading Law: The Interpretation of Legal Texts*, 73, (2012)*; see, e.g., Van Buren v. United States*, 141 S.Ct. 1648, 1657 (2021) ("When interpreting statutes, courts take note of terms that carry 'technical meaning[s]'"); *Digital Realty Trust, Inc. v. Somers*, 138 S.Ct. 767, 776-777 (2018) ("When a statute includes an explicit definition, we must follow the definition, even if it varies from a term's ordinary meaning."). Although "report" is not specifically defined in the WRDA, it is difficult to fathom that Congress would resort to using a commonly employed polyseme as an operative term in a later law to replace its own unique term of art — "environmental impact statement" — created for the purpose of facilitating landmark legislation like NEPA. *See Harco Holdings, Inc. U.S*. 977 F.2d 1027, 1032 (7th Cir. 1992). Thus, the technical nature of the term "EIS" or "ROD" strongly suggests that it is

not included within the term "report" under the WRDA. This finding is only supported by Congress' use of the term "report" elsewhere in the WRDA.

Within the Water Resources Development Act, Congress has established specific requirements for Corps' reports concerning water resources projects. Provisions of the WRDA strongly suggest that the term "report" constitutes reports submitted to Congress related to the planning and authorization of water resources projects. These provisions discuss requirements for the Corps' reports related to water resources projects which require specific authorization from Congress. For example, Section 2282a(f)(2), provides "Report completion- The completion of a report of the Chief of Engineers for a water resources project-- (B) shall be submitted, on completion, to--(i) the Committee on Environment and Public Works of the Senate; and(ii) the Committee on Transportation and Infrastructure of the House of Representatives."  Further, Section 2282a(g) provides that "not later than 120 days after the date of completion of a report of the Chief of Engineers that recommends to Congress a water resources project, the Secretary shall-- (A) review the report; and (B) provide any recommendations of the Secretary regarding the water resources project to Congress." The WRDA also describes project reports, general reevaluation reports, limited reevaluation reports, limited revaluation reports, and feasibility reports that must be prepared for any water resources project requiring specific authorization from Congress. *See* 33 U.S.C. §§ 2215(d) and 2282(a); *see also ACF Basin Water Litig*, 467 F. Supp. 1332. Thus, one aspect of the statutory scheme of the WRDA is for the submission of reports to Congress in the quest for legislative approval,

not for an agency's issuance of an EIS, FEIS, FSEIS or ROD.  Since the entirety of NWF's argument rises or falls on its interpretation of Section 2283, its claim that the Corps violated that provision also fails.

## ALLEGED VIOLATIONS OF THE FISH & WILDLIFE COORDINATION ACT

Next, NWF complains that the Corps violated the Fish and Wildlife Coordination Act, ("FWCA") 16 U.S.C.A. §661, et. seq. in that the Corps failed to consult with and obtain a report from the Fish and Wildlife Service ("FWS") before approving the Project. (Doc. 34-1, P. 49) The Corps responds arguing that the FWCA is not applicable and that, even if it is applicable, the Corps complied with the Act because it consulted with the FWS and state agencies. (Doc. 40-1, P. 59)

The FWCA is not "applicable to any project or unit thereof authorized before the date of enactment of the Fish and Wildlife Coordination Act if the construction of the particular project or unit thereof has been substantially completed." A project is "considered to be substantially completed when sixty percent or more of the estimated construction cost has been obligated for expenditure." 16 U.S.C.A. § 662 (West). The Corps contends that the Project was substantially complete as of the FWCA's enactment in 1958. But the Plaintiffs also argue that because the Project was modified or supplemented after 1958, the FWCA requires the Corps to consult and secure reports from the FWS and state agencies. (Doc. 34-1, P. 56). The Corps contends, however, that it did not modify or supplement the Project since 1927. (Doc. 40-1, P. 58).

As NFW points out, the Corps does not demonstrate that the record provides any historical or projected spending analysis from which it can determined whether the Project is "substantially complete". Moreover, the Corps does not point to any specific evidence that the Project was not modified or supplemented so as to make compliance with the FWCA's consulting and reporting requirements unnecessary. In short, there are factual disputes which prevent a summary judgment in favor of the Corps on the issue of applicability of the FWCA. But, the presence of issues of material fact as to application of FWCA does not end the inquiry because the record does demonstrate that the Corps has adequately met the consultation and reporting requirements of the Act.

Section 662(a) provides that "whenever the waters of any stream or other body of water are proposed or authorized to be" . . . "diverted, the channel deepened, or the stream or other body of water otherwise controlled" . . . the "agency first shall consult with the United States Fish and Wildlife Service, Department of the Interior, and with the head of the agency exercising administration over the wildlife resources of the particular State wherein" . . . "the diversion, or other control facility is to be constructed, with a view to the conservation of wildlife resources by preventing loss of and damage to such resources . . ." 16 U.S.C.A. § 662 (West).

Section 662(b) provides in pertinent part that "any report of the head of the State agency exercising administration over the wildlife resources of the State . . . shall be made an integral part of any report prepared or submitted by any agency . . . responsible for engineering surveys and construction of such projects when such reports are presented .

36

. . to any agency . . . having the authority . . . to approve a report on the modification or supplementation of plans for previously authorized projects, to which this Act applies." 16 U.S.C.A. § 662 (West).

NWF contends that the Corps failed to consult the FWS or appropriate state agencies for the purpose of preventing loss and damage to wildlife resources as required by §662(a). To the contrary, the record supports the Corps' position that it did fulfill its consultation obligations.  The Department of the Interior, in conjunction with FWS, submitted over one hundred "comments" in response to the Corps' consultation with FWS. (AR 1314-1335). The Missouri Department of Conservation and the Illinois Department of Conservation each submitted numerous comments and suggestions to the Corps. (AR 1336-1345). Each of the comments and suggestions were made part of the FSEIS in its Appendix E. The record illustrates that in response to these comments, the Corps addressed in great detail the concerns raised by NWF on a myriad of issues. The Corps responses are also part of the FSEIS. (AR 1357- 1413). In some instances, the Corps adopted the recommendations contained in the comments. In others, the Corps provided explanation and reference in support of its responses. In some responses, the Corps invited further consultation and cooperation, particularly with regard site-specific and programmatic issues. Agreement and consensus were not reached on each comment posed and, in those instances, the Corps makes clear its position and intended direction. The Court, having reviewed each of the responses, is unable to locate any that could be said to be insensitive, indifferent, or obtuse toward the corresponding comment or

expression of concern. NWF's argument that the Corps violated the FWCA by failing to consult with the FWS is simply not supported by the record.

NWF suggests almost in passing, and certainly without analytical development, that it was incumbent upon the Corps to direct the FWCA prepare a "report". (Doc. 34-1, P. 59). NWF fails to provide any basis for the suggestion that the Corps had the authority or power to do so, and nothing contained in the FWCA suggests that the Corps possesses such a cudgel.

This Court finds that the Corps has complied with the consultation and reporting requirements of the FWCA.

### ALLEGED VIOLATIONS OF THE 1927 RIVERS & HARBORS ACT

Plaintiffs' final claim is that the Corps violated the 1927 Rivers and Harbors Act by utilizing a 1,500-foot contraction plan and building river structures to reduce project costs by reducing the amount of dredging. (Doc. 34-1, P.50). There is no dispute that the Corps Project authority is limited by the 1927 RHA and that the Chief of Engineers Report limited the Corps' management of the Project. (Doc. 40-1, P. 53). Rather, NFW goes further and claims that the Act specifically limited the contraction width to a distance between 2,500 and 2,000 feet.

Indeed, the contention here arises out of an appropriations bill enacted in January 1927 creating "An Act authorizing the construction, repair, and preservation of certain public works" on many rivers and waterways throughout the United States. The then "existing project" involving the Mississippi River from St. louis to the mouth of the Ohio

38

River was "modified in accordance with the recommendations submitted by the Chief of Engineers in letter to the Chairman of the Rivers and Harbors Committee of the House of Representatives, dated December 17, 1926." 69 Cong. Ch. 47, January 21, 1927. NWF claims that paragraph 57 of "the 1926 Chief of Engineers Report established the following explicit limitations on the Project: (1) Constriction of the channel through regulating works and revetment is limited to a conservative width of 2,500 to 2,000 feet . . ." (Doc. 34-1, P.59) (AR 46968). But the Chief of Engineers Report does not create any such "explicit limitations" on the authority of the Corps and instead suggests in the body of his letter that "[t]he contraction be brought about by the regulating works" that "causes much less change in the original condition of the river than either the project of 1881 . . ." (AR 46968). "The 1881 project contemplated contraction to a width of about 2,500 feet." *Id*. In fact, Major Gotwals, the author, did not mention any specific limitation in the "Recommendations" section of his letter and only addresses the issue of contraction to say "[t]hat the regulating works of contraction and revetment be continued and completed". (AR 46975). So, while the Act does impose some limitations on the authority of the Corps, restricting it to any specific contraction width is not one of them.

NWF's argument that the 1927 River and Harbors Act created explicit limitations on the authority of the Corps to increase the amount of contraction in its efforts to fulfill its Congressionally imposed duty to maintain a navigable channel is not supported by the record. Accordingly, the Court finds that the Corps did not violate the 1927 Rivers and Harbors Act as alleged.

39

## CONCLUSION

The issues raised by the parties in their motions are largely the same due to the nature of the review necessary under the Administrative Procedure Act. Although these issues were discussed together, the Court nevertheless considered the parties' respective motions for summary judgment separately and on their own merits, and, where appropriate, construed all facts and inferences in favor of the party against which the motion under consideration was made. See *Blow v Bijora, Inc*. 855 F. 3d 793 (7th Cir. 2017)

In sum, the Plaintiffs have not revealed any clear error of judgment on the part of the Corps. Further, none of the Corps' decisions in this matter were shown to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the Administrative Procedures Act. Therefore, having determined that the Corps has followed the appropriate procedures, considered the relevant facts, and came to reasoned decisions, Plaintiffs' Motion for Summary Judgment (Doc. 34) is **DENIED**. Defendants' Cross-Motion for Summary Judgment (Doc. 40) is **GRANTED**.

The Clerk of Court is directed to enter judgment against Plaintiffs, and in favor of Defendants and close this case.

**SO ORDERED.**

Dated: January 22, 2022

_____
DAVID W. DUGAN
United States District Judge

40